UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Bankruptcy No. 11-40944 |
| GAC STORAGE LANSING, LLC, et al., | ) | (Jointly Administered) |
| | ) | |
| | ) | |
| Debtor. | ) | Hon. Jacqueline P. Cox |
| | ) | |

MEMORANDUM OPINION DENYING CONFIRMATION OF DEBTOR'S AMENDED
PLAN OF REORGANIZATION AND GRANTING RELIEF FROM STAY (dkt. nos. 612, 548)

**I.      Jurisdiction and Venue**

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2)(G) and (L). The Court has jurisdiction to entertain this matter

pursuant to 28 U.S.C. § 1334.

**II.     Facts and Background**

This matter is before the Court for determination of Confirmation of the Amended

Chapter 11 Plan of GAC Storage Copley Place, LLC (the "Debtor"), Bankruptcy No. 11-40953.

The Debtor's case is being jointly administered with the Chapter 11 cases of GAC Storage

Lansing, LLC (Case No. 11-40944) ; GAC Storage El Monte, LLC (Case No. 11-42638) ; the

Makena Great America Anza Company, LLC (Case No. 11-48549)  and San Tan Plaza, LLC

(Case No. 11-48939) for administrative purposes under Lead Bankruptcy Case Number 11-

40944.

The Debtor was formed on or about March 27, 2007 for the purpose of developing

approximately 3.9 acres of real property located at 5871 Copley Drive, San Diego, California into

2 buildings of 112,000 square feet of storage space (the "Property").  The Debtor is the owner

and operator of the self-storage facility. *See* Debtor's Exhibit B, Second Amended Disclosure

Statement.

-1-

The sole member of the Debtor is GAC Storage, LLC. The members of GAC Storage LLC are D.M.S.I., LLC (74%) (also a Guarantor), Sunset Storage Partners, LLC (25%) and Silver Valley Investments, LLC (1%). The members of D.M.S.I., LLC are Noam Schwartz (Guarantor), Y & T Iny Trust (Guarantor), CAT Investments, LLC, TAD 1993 Family Trust, and NS 1998 Family Trust. Ronnie Schwartz ("Schwartz"), who will be the sole and managing member of the Reorganized Debtor under the Plan ("Newco" or the "Reorganized Debtor"), is the brother of Noam Schwartz and the Secretary of Great American Capital, Inc., which is the Manager of D.M.S.I., LLC. Ronnie Schwartz also holds a beneficial interest in the TAD 1993 Family Trust. *Id.*

On or about April 13, 2007, the Debtor and Bank of America, N.A. ( the "Bank" or "BANA") entered into a Construction Loan Agreement by which the Bank agreed to lend the Debtor up to the maximum principal amount of $10,242,500 (the "Loan") to build the facility . In 2008, construction of the Property was completed, and the Debtor opened for business with a total of 1000 storage units and 38 RV spaces which totaled 90,520 square feet of rentable space. *Id.*

The Loan had a maturity date of April 13, 2009, however, the Debtor and the Bank entered into a modification agreement which extended the maturity date to December 13, 2011 and reduced the loan amount to $10,026.00. As a condition of the extension, the Debtor was required to make quarterly principal payments in the amount of $62,500.00. The Debtor made the January and April payments, but was unable to make the additional quarterly payments to the Bank. *Id.*

On October 7, 2011, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date"). Since the Petition Date, the Debtor has remained in possession and has continued to operate its business and administer its estate as a debtor in possession. *Id.* at 3.

On May 24, 2012, the Bank filed its Proof of Claim in the amount of $9,702,517.36

-2-

listing the amount of the secured portion of the claim as $8,300,000 and the unsecured portion as $1,402,517.36. (*See* Case no. 11-40953, Claim no. 2-3).

On September 27, 2012, the Debtor filed its Amended Plan of Reorganization. *See* Debtor's Exhibit A, dkt. no. 612.

The Bank filed its Supplemental Objection to Confirmation of the Amended Plan on October 8, 2012. *See* dkt. no. 626.

The Debtor's report of balloting, filed July 27, 2012, reflects that 2 ballots were cast accepting the Debtor's original plan by holders of unsecured claims, which amount totals $10,840.96. *See* Debtor's Exhibit D; dkt. no. 501.

The Debtor seeks confirmation of its Amended Plan over the objection of the Bank pursuant to the Bankruptcy Code's cramdown provision of 11 U.S.C. §1129(b) which allows confirmation of a plan or reorganization without the unanimous consent of creditors.

Commencing on October 11, 2012 and concluding on November 5, 2012, the Court held a five-day evidentiary hearing on Confirmation of the Debtor's Amended Plan.

**III.   The Debtor's Amended Plan**

   **A. Treatment of the Bank's Claim**

Class 2 of the Amended Plan consists of the Bank's Claim in the amount of $10,200,000. The Amended Plan provides that the Bank's Claim shall be allowed as of the Effective Date in the amount of $10,200,000 (dkt. no. 612, Section 2.2.2.) [1]. The Amended Plan proposes two scenarios under which the Bank's Claim is to be treated. Section 2.2.2 states that in the event the

---

[1] The Parties stipulated that for purposes of the Confirmation hearing that the Bank's Claim is to be valued as $10.2 million. *See* Trial Transcript, Volume II, at 219.

Bank votes to reject the Amended Plan, which is the case herein, for purposes of confirmation of
the Plan under § 1129(b), the Holder of the Allowed Claim will be deemed to have selected
option (i).

      That provision provides as follows:

    (i)      The Reorganized Debtor shall pay to the Holder of the Allowed Bank Claim: (A)
a lump sum payment in the amount of $200,000 from the Guarantor Contributions
on the Effective Date; (B) monthly principal and interest payments ("**Monthly
Payments**") on the unpaid balance of the Allowed Bank Claim, based on a thirty
(30) year amortization, with interest calculated at 4.6%,[2] which Monthly Payments
shall commence to accrue on the Effective Date, become payable on the fifth (5th)
day of the first full month after the Effective Date (the "**First Payment Date**"),
and continue to be paid on the same day of each month thereafter until the earlier
of the date the Allowed Bank Claim is paid in full or the Maturity Date; and (C) a
balloon payment of the unpaid balance of the Allowed Bank Claim plus any
accrued and unpaid interest, which balloon payment shall occur and shall be due
and payable on the Maturity Date.

      The Amended Plan further provides that in the event that option (i) governs the Amended
Plan, Newco will fund a Payment Reserve [in the amount of $250,000][3], which is to be used by
the Reorganized Debtor to supplement its monthly payments to the Bank, in the event it is unable
to fund the payments at the time the payments are due. If any balance of the Payment Reserves
remains once the Bank's Claim is paid in full, those funds will be returned to the Reorganized
Debtor. *See* dkt. no. 612, Amended Plan, Section 1.150, p. 6 & Section 2.2.2, p. 10.

      In sum, the Amended Plan proposes to pay down the Bank's $10.2 million dollar claim
over 7 years, at 4.61% interest. At the end of the 7-year term, the Amended Plan contemplates

---

    [2]Per the testimony and trial exhibits, the Debtor proposes to pay the Bank with interest of
4.61%. *See* Tr. Vol II, 233.

    [3]The Debtor's Second Amended Disclosure Statement provides for a New Equity
Contribution in the amount of $385,000. *See* Debtor's Exhibit B; dkt. no. 396, p. 5. However, the
evidence at trial establishes that this amount has been reduced to $250,000. See Tr. Vol. V, 1001-
02.

that a final balloon payment of approximately $8.7 million will be made to the Bank.

**B.     The Master Lease Agreement**

The Amended Plan also contemplates a 7-year Master Lease Agreement (the "Master Lease") which was executed on October 9, 2012.  Pursuant to the Master Lease, GAC Storage Copley, as landlord, will lease its real estate and storage facility business to the tenant, SE Copley Leasehold, LLC ("SE Copley"), who will operate the storage facility. *See* Debtor's Exhibit I, Master Lease Agreement.  SE Copley, an affiliate of Storage, Etc., is a special purpose entity formed to be a party to the Master Lease Agreement. *See* Trial Transcript, October 11, 2012, Vol. I, 172 ("Tr.").  The Master Lease requires that  SE Copley Leasehold provide a $1 million dollar letter of credit, or cash deposit of $1,000,000 as security.  (Tr. Vol I., 94).

The Master Lease provides that SE Copley will pay the Debtor monthly rental payments equal to the amount of net operating income set forth in the Debtor's 7-year cash flow projections. (*See* Tr. Vol. I, 88-89) The monthly payments are derived from the net operating income (less a 6% management fees) as set forth in the Debtor's projections. *See* Debtor's Exhibit J, Summation of Revenue of Master Lease Agreement. (*See* Tr. Vol. I, 98). The "year-one base rent" starts at $59,000 per month and increases annually to coincide with the anticipated increase of the Debtor's net operating income through the end of the 7-year plan term. *See* Debtor's Exhibit J, Master Lease Projections.  The rent payments due under the Master Lease Agreement will yield the Debtor $717,000 per year. *Id.*  Rent from the storage facility's  tenants would effectively flow through the SE Copley entity to the Debtor, which would fund the Debtor's payments to the Bank. In the event that the storage facility does not meet cash flow projections, SE Copley would draw from its operating reserve, which would be funded by the capitalization of the SE Copley Leasehold.  (*See* Tr. Vol. I, 98.)

The Master Lease Agreement is set to expire seven years after the rent commencement date. (*See* Debtor's Exhibit J; *See* Tr. Vol. I, 94).

### C.    The Guarantors Injunction

The source of funding for the Debtor's Amended Plan is a $250,000 new equity contribution by Ronnie Schwartz, the sole member of Newco, the reorganized Debtor, and a $200,000 contribution by the Loan's Guarantors, both of which are contingent upon court approval of a Guarantors Injunction in the Amended Plan. *See* Debtor's Exhibit A, Amended Pan, p. 20, Article VIII, Section 8.4.

### D.    The Debtor's Balloting report

The Debtor's Report of Balloting reflects that with respect to the Class 2 Bank Claim in the amount of 9,702,517.36, one vote rejected the Debtor's Amended Plan. Two ballots were received in connection with Class 4 Claims in the aggregate amount of $10,840.96 accepting the Debtor's Amended Plan. *See* Report of Balloting, dkt. no. 501, Ex. A.

## IV.    Discussion

### A.    Plan Confirmation

11 U.S.C. § 1129 sets forth the requirements for confirmation of a chapter 11 Plan. *See In re 203 N. LaSalle St. Partnership*, 126 F.3d 955, 960 (7th Cir. 2007), *rev'd on other grounds*, 526 U.S. 434 (1999). That section provides in pertinent part as follows:

(a) the court shall confirm a plan only if all of the following requirements are met:
(1) The plan complies with the applicable provisions of this title.

(2) The proponent of the plan complies with the applicable provisions of this title.

(3) The plan has been proposed in good faith and not by any means forbidden by law.

\* \* \*

(b)(1)    Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan

notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
(A) With respect to a class of secured claims, the plan provides–

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

\* \* \*

The plan proponent bears the burden of proving by a preponderance of the evidence that each of the requirements of § 1129(a) are met. *In re Mayslake Village-Plainfield Campus, Inc*, 441 B.R.309, 316 (Bankr. N.D. Ill. 2010); *In re Vita Corp.,* 358 B.R. 749, 750 (Bankr. C.D. Ill. 2007), *aff'd*, 380 B.R. 525 (C.D.Ill.2008); *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005).

**B. Feasibility of the Debtor's Amended Plan**

Section 1129(a)(11), which governs the Bankruptcy Code's feasibility standard, requires that: "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). "A bankruptcy judge has an affirmative obligation to ensure that a plan of reorganization is feasible." *In re Repurchase Corp.*, 332 B.R. 343.

"The feasibility requirement mandates that the plan proponent offer concrete evidence of cash flow to fund and maintain both its operations and its obligations under the plan." *In re American Consol. Transp. Cos., Inc.,* 470 B.R. 478, 489 (Bankr. N.D. Ill. 2012) (citing *Coones v.*

Document   Page 8 of 44

*Mut. Life Ins. Co. of N.Y.*, 168 B.R. 247, 255 (D.Wyo.1994), *aff'd*, 56 F.3d 77 (10th Cir. 1995)). In determining feasibility, a plan proponent is not required to show that the plan is guaranteed to succeed. *In re 203 N. LaSalle St. P'ship*, 126 F.3d at 961-62. Rather, a reasonable assurance of commercial viability is required. *Id.* In making this determination, the court may examine:

> (i) the adequacy of the capital structure; (ii) the earning power of the debtor's business; (iii) economic conditions; (iv) the ability of the management; (v) the probability of the continuation of the same management and (vi); any other matter that may affect the debtor's ability to perform the plan. *In re U.S. Truck Co., Inc.* 800 F.2d 581, 589 (6th Cir. 1986).

1.     **The Debtor has not Proven that the Value of the Property Will be Sufficient at the End of the Plan to make the required balloon payment.**

Here, the Bank argues that the Amended Plan fails to meet the feasibility standards of section 1129(a)(11) of the Bankruptcy Code because the Debtor cannot prove its ability to execute on a refinance or full payment sale by the maturity date. The Court agrees and finds that the Debtor has not established by a preponderance of the evidence that it will have the requisite financing to fund the final balloon payment.

***The Debtor's Expert***

The Debtor called Mr. Robin Detling, a commercial real estate appraiser for Colliers International to testify as its expert on valuation. Detling attended Brigham Young University where he received a bachelor's degree in management. In 2003, Detling joined Colliers International Valuation and Advisory Services where he serves as the managing director of its San Diego offices. *(See* Debtor's Exhibit R; Tr. Vol. III, 521). Detling conducts appraisals for commercial income-producing real estate, including self-storage facilities. (*See* Tr. Vol. III, 532). In 2010, Detling obtained an MAI (Member Appraisal Institute) Appraisal designation

from the Appraisal Institute, which is their commercial real estate appraisal designation. (*See* Tr. Vol. III, 529, 633-34). The MAI designation entails several hundred hours of professional education as well as submission of a sample demonstration appraisal report that is reviewed by peers in the appraisal industry. (*See* Tr. Vol III, 529). One third of his work consists of appraising self-storage and mixed used developments. Within the past year, Detling estimates that he has appraised 10 storage facilities and averages 5-10 appraisals per month. (*See* Tr. Vol III, 532). As a licensed appraiser, Detling is required to follow the Uniform Standards of Professional Appraisal Practice ("USPAP"), which he testified he followed in connection with preparing the appraisal of the Property herein. (*See* Tr. Vol. III, 534). Detling's valuation opinion for the Debtor's Property consists of a determination of the Property's as-is value, a 7-year prospective market value and a liquidation analysis.

Detling testified that he considered information on the Debtor's historical property performance, the building size, the percentage of income-producing units and rent rolls listing the tenants and the rent amounts paid. In addition, a physical inspection of the Property was conducted on May 16, 2012 by Lourdes Alamilla, Certified General Real Estate Appraiser . The inspection consisted of a partial walk-through of the storage facility. (*See* Tr. Vol. III, 550; Debtor's Exhibit R, pp. 11, 74.)

Detling employed the income and sales comparison approaches to valuation for this assignment and determined the as-is market value of the property to be $10,900,000, the stabilized value to be $11,500,000, and the 7-year prospective value to be $12,650,000[4]. (*See* Debtor's Exhibit R, Letter of Transmittal; Tr. Vol. III, 528, 620). Under the Income Approach, Detling utilized the direct capitalization method, in which he analyzes the relationship of one

---

[4]Detling's initial prospective value conclusion of $12,810,000 was re-calculated at trial to correct an error in his analysis. *See* Tr. Vol. III, 528, 620.

year's stabilized net operating income to total property value. (*See* Debtor's Exhibit R, p. 47).
Direct Capitalization entails converting an estimate of stabilized net operating income into an
indication of value by dividing it by an overall capitalization rate.  As explained in Detling's
report:

> the first step in the Direct Capitalization method is to estimate the subject's potential
> gross income. This process is accomplished through a comparison of the subject with
> similar properties having similar locations and utility. Vacancy allowance and operating
> expenses are deducted, based on market analysis.  Finally, the resulting net operating
> income is capitalized at an appropriate supported rate.

*See* Debtor's Exhibit R, p. 47.

In determining the "as-is" value, Detling measured the economic and physical occupancy
levels of the Property and compared them with regional average occupancy rates.   Physical
occupancy measures the occupancy of a facility based on how many units are occupied by
tenants, whereas economic occupancy factors in discounts, concessions received and credit loss.
*See* Debtor's Exhibit R, p. 34.  To account for vacancies and rent concessions, Detling applied a
combined rate of 10%.

At the time of the Property's inspection, the physical occupancy rate was at 66%, which
the evidence reflects was well below market rate for storage facilities. The evidence at trial
revealed that the physical occupancy rate as of September 2012, had grown to 79%.  Detling
explained that generally, a property with a higher occupancy rate would have a higher value but
noted that this increase in the Property's physical occupancy did not change his value conclusion.
(*See* Tr Vol. III., 557-58, 576-79).

To determine the 7-year prospective market value of the Property, Detling again

employed the direct capitalization method (*See* Tr. Vol. III, 535) which takes the estimated income generated by the Property at a future point in time (in this case, 7 years through 2019), then divides that figure by a residual, or future capitalization rate which results in a prospective value. (*See* Tr. Vol. III, 535. ) Detling explained that "when you're looking forward at future income, there's a bunch of uncertainties in the future[5]. You don't know exactly what the operating expenses will do. . . You're not entirely certain if the rent of the Property is going to grow fast or slow . . . ." (*See* Tr. Vol. III, 536). To account for such uncertainties, Detling testified that he applied a growth rate of 3% to the rental and other income beginning in year 2014; and an increase of 3% a year to account for the increase of expenses. *See* Debtor's Exhibit R, p. 72.

### *The Bank's Expert*

The Bank called Mr. Terence M. Connolly ("Connolly") as its valuation expert. Connolly received a Bachelors of Science degree from the University of San Francisco and has been a licensed appraiser since 1985. He is licensed in California, Nevada, Oregon and Washington, and has an MAI designation with the appraisal institute. (*See* Tr. Vol. IV, 760). Connolly testified that he averages 350 appraisals per year and estimates that he has conducted "thousands" over the course of his career. Connolly's valuation opinion for this Property consists of the determination of the as-is value, and the value at its stabilized rate.

Connolly employed the income and sales comparison approaches in his valuation analysis and considered the Property's size, physical location, its historic occupancy and vacancy levels, and the May, 2012 rent roll provided by the Bank. According to his report, the income approach

---

[5]In the Court's view, those uncertainties include the status of the economy, whether lenders have tightened lending requirements, and Washington's monetary policies.

involves capitalizing net operating income to produce an indication of value. *See* BANA Exhibit 1, p. 36. Under the income approach, Connolly used the direct capitalization method, one of two capitalization methodologies used for this approach. *Id.* Under this approach, Connolly first conducted an analysis of existing revenue for the subject Property. *See* BANA Exhibit 1, p. 36. Connolly compared the subject Property with comparables using available market rental data. The occupancy rate and self-storage rents of the subject Property were then compared to five area self-storage properties. *See* BANA Exhibit 1, p. 36. Based on market data, Connolly concludes the stabilized occupancy rate for this Property to be 88%. (*See* Tr. Vol. IV, 856). Connolly's conclusion as to the Property's stabilized value is $9,960.000. BANA Exhibit 1, p. 53.

In the free rent and concessions portion of his analysis, Connolly notes that occupancy rates for area self-storage facilities range from 87% to 92%. A-1 Storage, the facility closest to the subject Property, had a 92% occupancy rate. The subject Property's occupancy rate at the time of his report was 67%. For the Debtor's Property, Connolly determined a 6% effective rent loss/concession discount to be appropriate, explaining that the Debtor offers one month free rent out of 12 months. (*See* Tr. Vol. IV, 785-86; BANA Exhibit 1, p. 44). Connolly also deducts an additional 12% to account for additional vacancy and collection losses. *See* BANA Exhibit 1, p. 45. To arrive at the 12% figure, Mr. Connolly compared the historic vacancy rate of the subject Property with the vacancy rates of self-storage rental comparables surrounding the Debtor's Property. *See* BANA Exhibit 1, p. 38.

Under the sales comparison approach, Connolly compared the subject Property with five comparables similar in terms of physical characteristics. His conclusion as to stabilized value under this approach was $9,980,000, which he contends supports his income approach number of $9,600,000. (*See* Tr., 811).

To determine the "as-is" value of the Property, Connolly began his analysis with the stabilized value estimate of $9,900,000. *See* BANA Exhibit 1, p. 70.  Under this scenario, the value of absorption costs is discounted and includes marketing costs and time value to absorb the remaining unoccupied space to an 88% occupancy ratio, which corresponds to the vacancy rate (of 12%) used in the Income Approach. The absorption rate is the estimate of how many square feet the facility will rent monthly.  *(See* BANA Exhibit 1, p. 66; Tr. Vol. IV, 813). Connolly applies a discount rate of 15% of the stabilized value estimate, less an additional $54,000 advertising expense, which brings the "as-is" value to $8,150,000. *(See* BANA Exhibit 1, p. 70; Tr.,Vol. I, 816-18.)

### *The Debtor's Expert is not Credible*

After giving due consideration to the testimony and reports of both experts, the Court finds that the inconsistencies in Detling's report and the lack of data supporting his conclusions render his valuation conclusion unreliable.  The most damaging to Detling's credibility was his failure to properly provide for rental concessions and the vacancy rate when calculating gross potential rent under the income approach. *(See* Debtor's Exhibit R, p. 54. Tr. Vol. III 669-71.)

In general, both experts agreed that rent concessions are commonplace in the self -storage industry, however, they differed on how to correctly provide for these rates in their analysis. Connolly explained that it is important to separate the vacancy rates from concessions rates because the concessions loss is not accounted for in the market survey of vacancy rates. (*See* Tr. Vol. IV, 827-28).  He further explains that concessions are an important factor in the analysis because they represent money that the property owner does not collect.  (*See* Tr. Vol. IV, 785). According to his report, "self-storage properties tend to offer concessions to potential customers in order to gain business and occupy vacant units . . . The typical concession is one month free."

-13-

*See* BANA Exhibit 1, p. 44. Accordingly, Connolly based his concession conclusion on the concession rates for comparable properties, the Debtor's historic concession rate, and self-storage industry guidelines. (*See* Tr. Vol. IV, 787). Connolly concluded 6% to account for concessions and rent loss and noted in his report that market data supports a 12% stabilized vacancy and collection loss projection. *See* BANA Exhibit I, p. 44-45.

Detling, on the other hand, applied a vacancy factor of only 5.6% although, as noted in his report, self-storage operators and brokers report that a vacancy factor range of 10% - 20% is general industry standard for this market. *See* Debtor's Exhibit R, p. 41. To arrive at his vacancy conclusion, Detling testified that he "loaded up" [the 5.6%] for concessions and attributed a combined vacancy factor of 10%. (*See* Tr. Vol. III, 737; Debtor's Exhibit R, p. 56.) Further, the evidence reveals that only half of Detling's market area comparables reported vacancy rates. Thus, his analysis as to the appropriate rate is limited to 3 market comparables. (Tr. Vol. III, 658-59). The evidence also reveals that this variance in the rent concession and vacancy loss calculations resulted in a higher net operating income conclusion by Mr. Detling, thus skewing his ultimate valuation conclusion. (Tr. Vol. III, 627). According to Detlings's own testimony, "net operating income drives value," thus, "an increase in net operating income would cause a higher value, and a decrease in net operating income would cause a lower value." (Tr. Vol. III, 676). In the Court's view, these anomalies render Detling's conclusions unreliable.

In addition to the inaccuracies in his vacancy calculation, Detling admitted that he failed to provide for the vacancy rate of RV rental spaces in his analysis, which led to an in-court calculation to correct the figures set forth in his appraisal report. (Tr. Vol III, 570, 572-73).

The Court also finds that Detling's prospective value conclusion is unreliable. The Debtor's Amended Plan proposes to leave the majority of the Bank's claim unpaid until the end

-14-

of the 7-year term, at which time it will pay off the balance of $8,700,000 in full. *See* Debtor's
Response to Objection to Confirmation, Case No. 11-40944, dkt. no. 618, p. 7. Thus, Detling's
$12,650,000 prospective value opinion is offered to support the Debtor's assertion that it will
have the requisite financing based on future value at the end of the Amended Plan to pay the
Bank's Claim. However, Mr. Detling's own testimony seems to undermine his ultimate value
conclusion. In opining on the state of the economy, Detling testified that although there has
been some evidence of recovery in the San Diego area, there is still potential for further recovery,
and job growth. (Tr. Vol III, 561). He also opined that the storage facility market remains highly
uncertain (Tr. Vol III, 652) and that he did not consider San Diego to be in true recovery from the
recession. The evidence also reveals that the unemployment rate in San Diego, which according
to his report was 9.3% in February of 2012, remains above the national average. (*See* Debtor's
Exhibit R, p. 17; Tr. Vol III, 652). Despite these meager economic indicators, Detling opines
that applying an annual 3% growth rate in income and expenses adequately captures the
uncertainties associated with projecting income 7 years in the future. The Debtor's aggressive
projections simply do not line up with economic reality.

In contrast, the Court found the testimony provided by the Bank's expert, Mr Connolly,
respecting prospective value conclusions to be particularly persuasive and credible. Mr.
Connolly, an appraiser with 25 years' experience testified credibly that applying projected rates
that far out in the future is not something that he believes can be done with any degree of
accuracy. He testified that he would not make a 7-year projected calculation for the purpose of
establishing value. (*See* Tr. Vol. IV, 974-75).

In sum, the Court finds that the discrepancies in Detling's appraisal report and testimony
cast serious doubts on the accuracy of his valuation conclusions. The Court therefore concludes
that the Debtor has not proven by a preponderance of the evidence that it will have sufficient

-15-

equity or other resources to pay off the bank's claim in seven years. Thus, the requirements of section 1129(a)(11) have not been met.

The Court finds the valuation conclusion proffered by Connolly to be reliable, well reasoned and fully supported by the evidence.

Accordingly, the Court accepts the Bank's valuation and determines the as-is value of the Property to be $8,150,000.

2.      **The Debtor's Plan is based on Unsupported Projections**

Next, the Bank argues that the Plan is not feasible because it is based on unrealistic projections. The Debtor in turn argues that the income generated by the reorganized Debtor under the Master Lease Agreement will be more than adequate to fund Plan payments to the Bank with a $2 million cash buildup over the life of the Plan. Debtor's Response, dkt. no. 618, p. 6.

The Debtor did not present a feasibility expert in support of its Plan, but called Mr. Chris Lyons ("Lyons") to testify as a representative of Storage, Etc., a real estate company which owns, manages and develops self-storage properties. (Tr. Vol. I, 14). Lyons has been in the self-storage industry for 24 years and has served as Storage, Etc.'s Vice President for 12 years. In March, 2012, Storage, Etc. took over management of the Debtor's Property. (Tr. Vol. I, 31).

Lyons, who assisted with the preparation of the Debtor's 7-year cash flow projections, testified that since Storage, Etc. took over management of the Debtor's property, the physical unit occupancy has increased from 66% to 79% and that the Property is doing better than initially projected. According to Lyons' projections, by the end of year one (2013), the Debtor will have

-16-

an economic occupancy of 86.3% and a physical occupancy of 90.3%. (*See* Debtor's Exhibit O, Storage, Etc.'s September 2012 Projections.). To achieve those projections, Lyons explained that Storage, Etc. will continue to rent the storage units at prices similar to their current rate, with 3% annual rent increases through year 7. (Tr. Vol. I, 76-77). The projections forecast that the Debtor will remain at a stabilized occupancy level of 90% throughout the Plan term. ( *See* Debtor's Exhibit O).

The Bank called Mr. Keith Bierman ("Bierman"), a Certified Public Accountant, who testified as its feasibility expert and as an interest rate expert. Mr. Bierman has a degree in accounting from the University of Arizona, and has been in the accounting field for 12 years. He currently works at MCA Financial Group, where he has served as the Senior Managing Director for 12 years. The MCA Financial Group report was prepared by Morris C. Aaron, President and Senior Managing Director of MCA Financial Group, and Mr. Bierman. Bierman testified that he was very involved with the analysis, writing, findings and opinions contained therein. (*See* BANA, Exhibit 3, p. 1; Tr. Vol. II, 400.)

In his report, Bierman opined that the Debtor's Plan is not feasible due in part to the aggressive projections which are not consistent with the Debtor's current performance. He opined that the Plan fails to take into consideration factors such as anticipation of potentially declining future rental rates and additional rental rate concessions extended to entice existing tenants to stay. Further, Bierman observes that just a 10% deviation in the Debtor's revenue forecast results in negative cash flow of $(232,720) and $(60,439) in years 1 and 2. *See* BANA Exhibit 2, p. 4, Report of MCA Financial Group, Ltd. Bierman concludes that Debtor's Plan provides for aggressive assumptions for the leasing of vacant space which are not in line with current market conditions. The Court agrees.

-17-

Beyond the annual rent increases and the addition of internet marketing, the Court heard little evidence to substantiate the significant growth projected in the Debtor's Amended Plan.

The evidence reveals that the Debtor's projections require an average growth rate of 2.16% in the economic occupancy in the next 8 months when the Debtor averaged a monthly growth rate of only 1.44% in the in the past 8 months. *See* BANA, Exhibit 5, Analysis of Key Statistics Prepared by Debtor 10/8/12. The Court finds these projections to be speculative given the economic conditions of the area and the proximity of Debtor's competitor A-1 Storage which has better visibility, and according to Mr. Lyons, has had a 90% occupancy rate for "as long as [he] can remember." (Tr. Vol. I, 79).

The Court notes that although some of the Bank's concerns and the issues raised in Bierman's appraisal report have been addressed by the Debtor, such as the replacement of a non-binding letter of intent with the Master Lease agreement, many feasibility issues remain unresolved. The evidence presented at trial reveals that the entity SE Copley, the Debtor's tenant and sole source of income through the pendency of the Amended Plan, had yet to be capitalized at the time of the confirmation hearing. Further, Storage, Etc. had not obtained the letter of credit or the $1 million dollar security deposit due under the Master Lease. At trial, Lyons was unable to provide the name of a financial institution willing to provide a letter of credit, yet he remained optimistic that one would be obtained within 30 days. (*See* Tr. Vol. I., 102-05). In the event that the storage facility is unable to achieve the net operating income projections which dictate SE Copley's rental payments to the Debtor, there is no evidence that SE Copley has sufficient capital reserves to fulfill its contractual obligations to the Debtor, leaving the Debtor without funds to provide its payments to the Bank. When questioned on cross examination regarding the likelihood that Storage, Etc. would obtain these securities, Mr. Lyons replied that he was "very comfortable that will happen." *See* Tr. Vol. I., 102-05. Unfortunately for the Debtor such

-18-

assurances absent concrete evidence are insufficient to establish that the terms set forth in its Amended Plan are feasible. *Chase Manhattan Mortgage & Realty Trust v. Bergman (In re Bergman),* 585 F.2d 1171, 1179 (2d Cir. 1978) ("Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises."). The scarcity of such vital information is fatal to the Debtor's Plan, as the rental income under the Master Lease Agreement is the sole source of funding for the Debtor's Plan.

For those reasons, the Court finds that the Debtor has not met its burden of showing that the Amended Plan is feasible under 11 U.S.C. § 1129(a)(11), which requires in part that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan.

### C.      The Debtor's Plan fails to meet the Cram Down Requirements of Section 1129(b).

The Bank also objects to Confirmation of the Amended Plan because the Debtor's proffered interest rate of 4.61% does not reflect the risk of non-payment and submits that an appropriate rate of interest for the Bank's claim is at least 8.2%. It contends that the Plan's treatment of the Bank's claim violates the fair and equitable test and for that reason confirmation of the Plan should be denied.

Section 1129(b) provides that a plan that satisfies the requirements set forth in 1129(a), except for subsection (a)(8), may be confirmed over a creditor's objection, if the plan does not discriminate unfairly between impaired classes and is fair and equitable to the class of creditors that have rejected the plan. 11 U.S.C. § 1129(b)(1). *In re Mayslake,* 441 B.R. at 316.

-19-

Where the plan provides for the retention of the creditor's collateral, the condition that the plan be fair and equitable with respect to a class includes the following requirements: i) that the plan provides that the creditor retains its lien on the collateral; and ii) the creditor receives deferred cash payments equal to the present value of the allowed claim. 11 U.S.C §1129(b)(2)(A).  Further, the plan or reorganization cannot unfairly shift the risk of a plan's failure to the creditor. *In re Monarch Beach Venture Ltd.*, 166 B.R. 428, 436 (C.D. Ca. 1993).

Accordingly, the Debtor's Plan must propose an interest rate adequate to assure the realization of the Bank's claim, which for purposes of confirmation, is $10,200,000. *See In re Bloomingdale Partner, LLP*, 155 B.R. 961, 977 (Bankr. N.D.Ill. 1993).

While the Debtor bears the burden of proof on plan confirmation issues, it is the Bank that bears the burden of establishing that an additional risk adjustment is necessary. *See In re American Consol. Transp. Cos., Inc.* 470 B.R. at 487; *Till v. SCS Credit Corp.*, 541 U.S. 465, 484-85 (2004) ("[T]he formula approach, which begins with a concededly low estimate of the appropriate interest rate and requires the creditor to present evidence supporting a higher rate, places the evidentiary burden on the more knowledgeable party, thereby facilitating more accurate calculation of the appropriate interest rate.")[6].

## 1. Determination of an Appropriate Rate of Interest

The Court finds that the rate asserted by the Debtor fails to capture the risk inherent in its

---

[6]Compare with *In re DeTienne Assocs. L.P.,* 2005 Bankr. LEXIS 3122, *18-19 (Bankr. D. Mont. 2005*)*, where a bankruptcy judge opined that the burden of satisfying the cramdown requirements under section 1129(b) remain with the debtor despite the Supreme Court's decision in *Till v. SCS Credit Corp.*

Plan and concludes that 8.2% is an appropriate rate of interest given the Debtor's circumstances.

In support of its proffered rate, the Debtor called Mr. Kenneth Funsten ("Funsten"), CFA to testify as its expert interest rate analyst. Funsten received an MBA in finance and real estate from the University of Southern California and has over 20 years experience as a debt analyst, trader and portfolio manager. (Tr. Vol. II, 225-27; Debtor's Exhibit T, p.32.) To prepare for his report, Funsten reviewed the Debtor's Amended Plan and Second Amended Disclosure Statement, cash collateral budget, rent rolls, and conducted a site visit of the Property. He also relied on the figures and assumptions set forth in the Master Lease with Storage, Etc., and the appraisal report of Mr. Robin Detling, the Debtor's appraiser. (Tr. Vol. II, 234.). He ultimately concluded that the interest rate of 4.61% was adequate. *See* Debtor's Exhibit U.

Funsten opined that no market exists for the Loan, as the Debtor's Property is over-leveraged with a Loan-to-Value ratio of 90%, which is above the level at which commercial banks are making loans. (*See* Debtor's Exhibit T, p.16; Debtor's Exhibit U, Tr. Vol. II, 235-39, 316.) Therefore, Funsten followed the Blended Rate Approach, which he describes as a *"Till-guided"* formulaic method, and concluded that 4.61% is an appropriate rate of interest for this loan as required by section 1129(b)(2)(A).

Funsten explains that the Blended Rate Approach entails dividing a single loan into a series of risks, or tranches, and then using weighted factors to evaluate each risk's appropriate interest rate before "blending" those rates together into a single interest rate. *See* Debtor's Exhibit T, p. 20. The Blended Rate Approach fixes how much of a plan's proposed new loan deserves an interest rate of prime (the "A" tranche, or the conforming loan piece) and how much of the new loan deserves a rate substantially higher than prime (the "B" tranche). This approach gives degrees of risk their own interest rate, their own risk-rates, and then weighs and reblends the

-21-

results to determine a single number. Debtor's Exhibit T, p. 21. Funsten first selected the prime rate of 3.25% to the A tranche. To the B tranche, he assigned a blended interest rate which of 8.18% which he derived from combining a treasury bill rate and a junk bond rate. *See* Debtor's Exhibit U, p.1. The Blended rate totals 4.61%.

In his report, Funsten provides a narrative of the collateral, the capacity, plan circumstances and property characteristics (commonly referred to as the four C's of Credit) that were considered in formulating his interest rate conclusion. *See* Debtor's Exhibit T, Section F, p. 14. Funsten considered the current performance of the Debtor's Property, noting that "[c]urrent and projected financial performance shows rapidly improving operations." Funsten also noted in his report that the marketing efforts by the Debtor, and its manager, Storage, Etc. have resulted in improved financial results which are expected to continue to improve in the future. Debtor's Exhibit T, Section E, p. 13. He also relied on the Debtor's 7-year cash flow projections, which show that the Debtor will need $615,000 annually to fund its payments to the Bank. (*See* Tr. Vol. II, 261.).

In his discussion of the Property Characteristics, Funsten expressed that the diversity of the Debtor's cash flow, with over 1000 tenants, was one of the positive aspects of the Debtor's Plan. *See* Debtor's Exhibit T, p. 15. He explained that this characteristic has a "more certain prospect of creditor repayment, than other smaller, less diversified properties." *Id.* However, when questioned about the newly executed Master Lease, which in essence replaces that "1000 tenants" with one master tenant, (SE Copley), Funsten suggested that this too is a positive characteristic because it improves the certainty of the Debtor's cash flow and assures a revenue stream. (Tr. Vol. II, 269, 337.) Funsten explained this variance in his opinion by noting that with the Master Lease, the Debtor now has a lessee that has contractually guaranteed payments over 7 years, as opposed to having multiple lessees to provide the same revenue stream. (Tr. Vol

-22-

II, 255.) Funsten also opined that the Property is in good repair, and therefore has low need for capital improvements.

Funsten defended his interest rate opinion by explaining that because appraisals by nature reflect the risk that the borrower may not be able to perform, care must be taken not to "double-count," thereby artificially increasing the Debtor's risk and the Property's risk. *(See* Debtor's Exhibit T, p. 17.)

The Bank counters that an interest rate in excess of the 4.61% per annum is necessary to provide it with the present value of its secured claim and submits that 8.2% is an appropriate rate of interest.

Mr. Keith Bierman, the Bank's interest rate expert, also employed a formula approach (also referred to as the "build-up" method), and the market approach to his analysis and determined 8.2% to be an appropriate rate of interest given the circumstances surrounding the Debtor's Plan. *See* BANA, Exhibit 2, p. 5.

Under both approaches, Bierman assumes that the value of the Debtor's Property is $8.15 million, and has a Loan to Value rate in excess of 100%. (Tr. Vol. II., 402-03.) According to Bierman's report, the Formula Approach consists of a base rate, plus additional factors to compensate for risks associated with a specific borrower or terms of repayment. He explains that his risk analysis is dependent upon risk factors such as i) default risk; ii) security risk, and iii) interest rate risk. *See* BANA, Exhibit 2, pp. 5-7.

Under the formula approach Bierman began, as did the Debtor's expert, with the prime rate of 3.25 %. However, Bierman assigns an additional security and default risk adjustment of

-23-

2% to account for the additional default risk that the Debtor will be unable to make the payments under the Plan. Bierman makes this risk adjustment because in his view, the Debtor's Plan relies on "unreasonably optimistic" and aggressive assumptions for rental rates and the lease-up of the existing vacant storage space. *See* BANA, Exhibit 2, p. 6. He observes that the risk of default is considerable given that the Debtor has not established that sufficient income can be generated from the Property or that the New Equity contribution under the Amended Plan is available and sufficient. *See* BANA, Exhibit 2, p. 6. Bierman next assigns a 1% risk adjustment as the Interest Rate risk for the 7-year term of the Debtor's loan. Interest rate risk is the risk a lender takes by providing fixed financing while its cost of capital is variable. He explains that the interest rate risk adjustment is necessary because the Debtor's Plan exceeds the conventional 3-year term, and this adjustment compensates the Bank for fluctuations in interest rates over the course of the Debtor's 7-year plan term. (*See* BANA, Exhibit 2, p. 6.)

Bierman next applied a 2% adjustment to account for Security and Default Risk for a loan above 65% to 90% loan to value. He notes that in this case, the loan to value ratio is assumed to be 100%, which is outside of traditional lending guidelines. *Id.* at 6; Tr. Vol. II, 412. Bierman explains that 2% is an appropriate risk adjustment because this is the riskiest piece of the Debtor's loan. Thus, the 2% is combined to 6.25% to arrive at the interest rate of 8.25%. Bierman then applies a weighted interest calculation to portions of the loan amount to arrive at the appropriate rate of interest of 8.2%[7]. (*See* BANA Exhibit 2, p. 8; Tr., 414-15.). A chart illustrating Bierman's build-up rate approach has been reproduced below:

---

[7]In his supplemental report on feasibility, Bierman expressed additional concerns regarding the non-binding nature of the letter of intent. As noted above, the letter of intent has since been replaced with a 7-year Master Lease Agreement between Storage, Etc. and SE Copley. *See* BANA, Exhibit 4. However, Bierman testified that even with these changes, his ultimate interest rate conclusion is unchanged.

-24-

| | Rate Build Up |
|---|---|
| Prime Rate | 3.25% |
| Security & Default Risk -- | 2.00% |
| Interest Rate – conforming 65% LTV, 3-year term | 5.25% |
| Interest Rate Risk for 7-year term | 1.00% |
| Interest Rate– conforming 65% LTV, 7-year term | <u>6.25%</u> |
| Security & Default Risk for loan above 65% to 90% LTV | 2.00% |
| Interest Rate for portion above 65% to 90% LTV | 8.25% |

*See* BANA, Exhibit 2, p. 8.

Bierman next employed the market approach, whereby market lenders are surveyed to determine the terms lenders offer to the very best borrowers under conforming loan conditions. The market rate approach is a separate analysis used to verify the reasonableness of the assumptions in the formula rate approach. (Tr. Vol. II, 490-91.)  This approach consists of a market survey of lenders to determine a) if a market for the Debtor's loan exists; and b) the current market rate of interest if such a loan were available to the Debtor. *(See* BANA, Exhibit 2, p. 5; Tr. Vol. II, 409.)  Bierman testified that he uses the market approach to verify that the assumptions made under the formula approach are accurate. (Tr. Vol. II, 417.)

In opining on the Debtor's proposed interest rate, Bierman testified that the Debtor's expert failed to account for the risks associated with the Bank's claim. (Tr. Vol. II, 421.)  He opined that the interest rate proposed by the Debtor is not an appropriate interest rate, given the repayment terms of the Plan, the risk inherent in the Plan, the current occupancy level and cash flow of the Property, as well as current market conditions. *(See* BANA, Exhibit 2, p.3).

2.    **The Bank's proffered rate is the appropriate Rate of Interest**

Although both experts contend they followed the guidelines set forth in the Supreme Court's plurality decision in *Till v. SCS Credit Corp.*, the Court finds that the interest rate proffered by the Debtor does not provide an adequate risk adjustment given the circumstances of the Debtor's Plan.

In *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), the Supreme Court opined on the correct approach for selecting an appropriate rate of interest for cramdown in a Chapter 13 context. There, the plurality concluded that a "prime plus" formula rate approach, which is based upon the prime rate of interest, best carries out Congress's intent for the Bankruptcy Code provisions requiring discounting to present value. 7 COLLIER ON BANKRUPTCY ¶ 1129.06[1][c] (Alan N. Resnick & Henry J. Sommer eds., 16 ed. Rev.). Speaking for the plurality, Justice Stevens opined that "[t]he 'prime plus' rate of interest depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor." *Till*, 541 U.S. at 478-80. While declining to decide the scale for risk adjustment, the Court noted that other courts generally approved adjustments of 1 - 3%. *Id.* at 480. The Court went on to note that the cramdown requirement "obligates the court to select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan. If the court determines that the likelihood of default is so high as to necessitate an "eye-popping" interest rate, the plan probably should not be confirmed." *Id.*

Here, the Court finds that the circumstances of the Debtor's Amended Plan and the characteristics of the loan indicate that a 1-3% risk adjustment does not adequately compensate the Bank for all of the risks it faces. Accordingly, the Court determines that the higher interest rate adjustment proffered by the Bank is appropriate under the circumstances.

-26-

The Debtor's expert provides a cursory review of the collateral, capacity, plan circumstances and property characteristics he considered in his analysis, however, it is not clear from his report or from his testimony at trial that those risks were actually provided for in his ultimate interest rate conclusion.

The Court finds that Bierman's report by contrast more aptly evaluates all of the risks in light of the circumstances of the Debtor's Amended Plan. Mr. Bierman identified and explained the specific risk factors of the Loan and applied a series of rates using a formula approach. His report provides a detailed study of the Debtor's Plan, the projections therein, and the risks inherent given those figures. Bierman provides a well-reasoned analysis of the build-up approach, in which he begins with a prime rate of 3.25%, and assigns additional rate adjustments to account for the Debtor's non-conforming self-storage building loan with a loan to value of 65%, to account for specific risk factors associated with the 7-year plan. Bierman then conducts a market survey to ensure that his interest rate conclusion is consistent with rates in the appropriate market. (Tr. Vol. II, at 417; Bank's Exhibit 2, pp. 8-9).

Accordingly, the Court finds the interest rate advanced by the Debtor does not sufficiently capture the risk that the Debtor will not satisfy the Bank's claim. The 8.2% interest rate conclusion submitted by the Bank is supported by the data provided in Bierman's report and the additional evidence presented at trial.

### D.      Debtor's Plan Fails to Satisfy Disclosure Requirements.

The Bank also complains that the Plan cannot be confirmed because the Debtor has not complied with the disclosure requirements of section 1127 of the Bankruptcy Code.

Section 1127(a) provides that the proponent of a plan may modify a plan at any time before confirmation. 11 U.S.C. § 1127(a). However, the plan proponent must also satisfy disclosure requirements of section 1125 with respect to the plan, as modified. *See* 1127(c). 11 U.S.C. § 1125 provides:

(a) In this section–

> (1) "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

The purpose of a disclosure statement is to provide creditors the information they need to decide whether to accept or reject the debtor's plan. The determination of whether the disclosure statement contains adequate information is made on a case-by-case basis under the facts and circumstances presented. *In re Scioto Valley Mortgage Co.,* 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988).

Upon review of the Amended Plan, it is clear that the Debtor has not complied with the disclosure requirements of section 1125 as the Debtor fails to provide any information regarding the recently executed Master Lease Agreement or about the identity of the tenant under the agreement, SE Copley. Because the rental income due the Debtor under the Master Lease Agreement is the sole source of funding under the Plan, the Court finds it critical that this information be included so that creditors can make an informed decision on whether to vote for the Debtor's Amended Plan. As noted by the Bank in its Supplemental Objection, the Second

-28-

Amended Disclosure Statement is also devoid of information concerning the financial condition of the newly formed tenant entity, SE Copley, its parent Storage, Etc., and the business relationships between the Master Lease tenant, the Debtor, and its guarantors. *See* dkt. no. 626, p. 5.

The Second Amended Disclosure Statement is also defective in that it fails to accurately provide for the amount of the new equity contribution under the Amended Plan. The Debtor's Second Amended Disclosure Statement provides in part that Schwartz will make a new equity contribution in the amount of $385,000. *See* Debtor's Exhibit's B, Section III, p.5. However, according to the evidence presented at trial, Schwartz's contribution will be $250,000. (*See* Tr. Vol. V, 1001-02). Accordingly, the Court concludes that the Debtor's Amended Plan fails to comply with the disclosure requirements of Section 1127.

In a related objection, the Bank also argues that the Amended Plan does not satisfy Section 1129(a)(5) of the Bankruptcy Code because it does not provide information regarding post-confirmation management of the Reorganized Debtor.

Subsection 1129(a)(5)(A)(i) requires that:

The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan

11 U.S.C. § 1129(a)(5)(A)(i).

The Court notes that the Debtor's Second Amended Disclosure Statement provides some indication of the management structure of the Reorganized Debtor. There the Debtor discloses that none of the Debtor's current owners or Guarantors shall have any ownership interest in the

-29-

Case 11-40944    Doc 764    Filed 01/10/13    Entered 01/10/13 16:53:28    Desc Main
Document      Page 30 of 44

Reorganized Debtor, but explains that "it is possible that third party investors, such as Storage, Etc., may at some time in the future acquire ownership interest in [the reorganized Debtor]." *See* Debtor's Second Amended Disclosure Statement, dkt no. 396, Section III. A, p. 5. However, the Amended Plan is silent as to the management structure of the Reorganized Debtor. According to Mr. Schwartz's testimony at trial, he intends to bring on either himself or another entity which he would control as the manager of Newco (Tr. Vol. V, 1057-58) and that the manager would have a 1% ownership interest in Newco. This information is not noted in the Debtor's Amended Plan. Without that disclosure, creditors have no way of knowing this until after the Amended Plan has been confirmed. Debtor's failure to supply this information in its Amended Plan constitutes a failure to comply with section 1129(a)(5)(A)(i).

### E.    Application of Absolute Priority Rule

The Bank also objects to confirmation of Debtor's Amended Plan under the "absolute priority rule." It argues that because the Amended Plan proposes to transfer the equity interests of the Debtor to certain insiders, it allows the current principals to determine who will own equity of the reorganized debtor and how much they will pay. The Debtor argues that the Bank has no standing to assert the absolute priority rule as the class of unsecured creditors has voted to accept the Amended Plan. 11 U.S.C. § 1129(b)(1) provides:

> Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

* * *

> (B) With respect to a class of unsecured claims–

-30-

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property
. . . .

11 U.S.C § 1129(b)(1) and (b)(2)(B).

Under the "absolute priority" rule, claims of any objecting, impaired class must be paid in full before a class of claims junior to it is allowed to retain any interest under a Chapter 11 plan. 11 U.S.C. §1129(b)(2)(B)(ii); *In re Greenwood Point, LP*, 445 B.R. 885, 909 (Bankr. S.D. Ind. 2011). The absolute priority rule is one of the conditions of the "fair and equitable" standard necessary for cram down of a proposed Chapter 11 plan over objection of an impaired creditor. *In re Sentinel Mgmt. Group, Inc.* 398 B.R. 281 (Bankr. N.D. Ill. 2008). Where one or more classes of claims entitled to vote reject the plan, any member of the rejecting class may file an objection to confirmation of the plan based on any alleged violation of the absolute priority rule.

In this case, the Bank argues that it is undersecured and thus, has a deficiency claim which would grant it standing as a member of the class of unsecured creditors.

Under the Amended Plan, the Bank's claim is treated as wholly secured. However, as noted above in this Court's opinion, the Court has accepted the Bank's appraisal value of $8,150,000. Thus, pursuant to section 506(a), the Bank has a deficiency claim in the amount of $2,050,000[8] and may have standing to invoke application of the absolute priority rule.

Next, the Bank argues that the "insider nature" of the Plan warrants application of the

_____

[8]This amount reflects the parties stipulation that for purposes of confirmation, the Bank's claim be treated as $10.2 million. *See* Trial Transcript, Volume II, at 219.

-31-

absolute priority rule. The Bank submits that Schwartz formulated the Amended Plan primarily for his own benefit, and for the benefit of Noam Schwartz, Yoel Iny and their families. The Debtor responds that applying the absolute priority rule in this case violates the plain meaning of the statute, as the Debtor's Plan does not involve the transfer of "old equity." Accordingly, the Debtor urges this Court to interpret the statute literally. *See* Tr. Vol VI., 1240-44.

The Absolute Priority Rule prohibits "current holders of equity from retaining any interests or property on account of their equity interests unless senior classes are paid in full." *In re Greenwood Point, LP*, 445 B.R. at 910. The current ownership structure of the Debtor is as follows: GAC Storage, LLC is the sole member of the Debtor. The members of GAC Storage, LLC are D.M.S.I., LLC (74%), Sunset Storage Partners, LLC (25%) and Silver Valley Investments, LLC (1%). *See* Debtor's Exhibit B, p.2, Second Amended Disclosure Statement. The five members of D.M.S.I., LLC are Noam Schwartz, Y & T Iny Trust, CAT Investment, LLC, TAD 1993 Family Trust, and NS 1998 Family Trust. Schwartz, who will be the sole and managing member of the reorganized Debtor, holds a beneficial interest in the TAD 1993 Family Trust. The Bank argues that given this interest in the Debtor, application of the absolute priority rule is appropriate.

The transfer of new equity here does not trigger the absolute priority rule. It is clear from the evidence that Mr. Schwartz is not a "current holder" of an equity interest of the Debtor" within the plain meaning of the statute. GAC Storage is the owner of the Debtor. Mr. Schwartz is a partial owner of GAC Storage through the TAD 1993 Family Trust. *See In re Greenwood Point, LP*, 445 B.R. at, 910 ("[T]he absolute priority rule does not apply to individuals who are not current owners of the debtor, whether or not those individuals are insiders."). Schwartz testified that none of the current members or Guarantors will be involved in the management of the Reorganized Debtor after confirmation, which testimony was not rebutted by the Bank. The

Bank nonetheless points to Schwartz's personal and business relationships with his friend, Mr.
Yoel Iny, and brother Noam Schwartz as "motivation" for Schwartz to preserve the equity in the
Property. Beyond the Bank's suspicion in this regard, there is no evidence to suggest that
Schwartz's purchase of new equity allows the current owners of the Debtor to retain their interest
or that Schwartz will later act as a "straw man" to subsequently transfer his interest to the former
equity holders. *Id.* at 911. To the contrary, the Debtor notes in its Second Amended Disclosure
Statement that none of the Debtor's current owners or Guarantors shall have any ownership
interest in the reorganized Debtor. *See* Debtor's Exhibit T, Section III. A. , p. 5. Although the
Court deems the absolute priority rule to be inapplicable here, it reminds the Bank that the
Bankruptcy Code nonetheless provides additional "safety nets" to guard against such suspected
collusive efforts. *See In re* Greenwood Point, LP, 445 B.R. at 910, citing *Beal Bank, S.S.B. v
Water's Edge Ltd. Partnership (In re Beal Bank)*, 248 B.R. 668, 680 (D.Mass. 2000) ("The
Bankruptcy Code does not prohibit such sales, and instead relies on the confirmation
requirements as the safety net."); *See also* 11 U.S.C. §§ 1125, 1129(b)(1).

### F.    The Guarantors Injunction is Overly Broad and is Not Essential to the Debtor's Reorganization.

The Bank objects to the inclusion of the Guarantors Injunction, which it contends is not
essential to the Debtor's Plan and improperly deprives it of its bargained for state law rights
under the Loan Guaranties.

The proper standard for approval of a release in a plan of reorganization in favor of a non-
debtor third party is that the provision be narrowly tailored and essential to the reorganization
plan as a whole. *See In re Ingeroll, Inc.*, 562 F.3d 856, 864-65 (7th Cir. 2009); *In re Airadigm
Commc'ns, Inc.*, 519 F.3d 640, 657 (7th Cir. 2008).

-33-

Thus the Court must determine whether the injunction in question is appropriate for the Debtor's Amended Plan. The Court determines that it is not.

The release at issue herein provides as follows:

> Guarantors Injunction. In consideration for Newco funding the New Equity Contributions and for the Guarantors funding the Guarantor Contributions, entry of a Confirmation Order will operate as an injunction against the commencement or continuation of any action, the employment of process, or any act to collect, recover or offset any Claim of any Holder against the Guarantors under the Bank Loan Documents or otherwise, which Guarantors Injunction shall be effective so long as the Reorganized Debtor is performing its obligations under the Plan and non Default has occurred.

*See* Debtor's Exhibit A, Amended Plan, p. 20, Article VIII, Section 8.4.

The Guarantors of the Loan Documents include: D.M.S.I., LLC, Noam Schwartz, Yoel Iny, and Y & T Iny Trust. The inclusion of the Guarantors Injunction is a condition precedent to the $250,000 New Equity Contribution by Schwartz, and the $200,000 Guarantors' contribution to the Plan. Schwartz is an officer of Great American Capital, the former manager of the Debtor. Schwartz, who will be the sole member of the newly organized Debtor, testified that he will contribute the $250,000 only if the Guarantor's Injunction is approved. He also testified that this amount would be placed into a reserve account, untouched until the Bank's loan was "taken care of." He explained that this reserve would be used for unknown expenses, or shortfalls to take care of monthly payments to the Bank. In addition, the Guarantors would contribute $200,000 in exchange for the Guarantor's Injunction, characterized by Schwartz as a "temporary injunction."

Schwartz testified that the provision is necessary because of concerns that the Bank would initiate unnecessary litigation against the Guarantors. When asked to expound on this, however, Schwartz merely stated "if the Guarantors are going to have to defend a legal action,

-34-

you never know what the outcome is. . . maybe the debtor would be dragged into it somehow . . .
." (Tr. Vol. V, 1010.)  Schwartz was unable to articulate any sound business reasons for
including this provision or why the success of the Amended Plan is contingent upon its inclusion.
Schwartz also testified that he made no efforts to solicit third party equity contributions in lieu of
the injunction because he did not believe investors would walk into the shoes of a debtor in
bankruptcy that could also be subject to the Bank's claims.

In support of the proposed Guarantors Injunction, the Debtor relies on the Seventh
Circuit's decision *In re Airadigm Commc'ns, Inc.*  In *Airadigm*, the court considered whether a
bankruptcy court has the authority to release a non-debtor third party from creditor liability over
the creditor's objection. The court ultimately held that such a  release is "appropriate," but
explained that "[w]hether a release is 'appropriate' for the reorganization is a fact intensive
inquiry and depends on the nature of the reorganization. *Airadigm*, 519 F.3d at 657.  For the
release at issue in that case, the court first determined that the limitation itself was narrow, in that
it applied only to claims "arising out of or in connection with" the reorganization itself; next the
court determined that "the limitation is subject to the other provisions of the plan; and third, there
was 'adequate' evidence that the financier of the plan "required the limitation before it would
provide the requisite financing, which was itself essential to the reorganization." *Id.* at 657.  *See
also In re Berwick Black Cattle Co.*, 394 B.R. 448, 459 (Bankr. C.D. Ill. 2008) ("The release at
issue in *Airadigm* was nothing more than the kind of narrowly tailored release that is customary
in Chapter 11 plans . . . [N]evertheless, it was not simply rubber stamped by the Seventh Circuit,
which applied a three-part analysis.")

The bankruptcy court in *In re Berwick Black Cattle Co.* denied confirmation of a plan that
included a blanket third party lease provision. 394 B.R. at 457. The release at issue in that case
included pre-petition claims and claims that were unrelated to the bankruptcy proceedings. The

-35-

court held that such releases went well beyond what the Seventh Circuit approved in the
*Airadigm* decision, as they purported to release from liability third parties in a non-bankruptcy
suit over which the court had no jurisdiction. *Id.* at 462.

Here too, the Court finds that the Guarantors Injunction is overly broad. The Guarantors
Injunction at Section 8.4 of the Amended Plan purports to enjoin Bank of America from the
"commencement or continuation of an action, the employment of process, or any act to collect
recover or offset any Claim of any holder against the Guarantors under the Bank Loan *or
otherwise,* which Guarantors Injunction shall be effective so long as the Reorganized Debtor is
performing its obligations to the Bank under the Plan and no Default has occurred." (Emphasis
added). The provision is not narrow in scope, as the clause "or otherwise" seems to categorically
enjoin the Bank from pursuing its contractual remedies against the Guarantors for other loans
that the Bank has with the Guarantors herein. The Bank rightfully has cause for concern given
this broad language, as the Guarantors have additional obligations under additional loan
documents. For example, the Bank notes in its Supplemental Objection that the Guarantors have
obligations under an environmental Indemnification and Release Agreement dated April 13,
2007 and that the Guarantors are obligated to provide financial statements and have made
representations, warranties and covenants to the Bank. *See* dkt. no. 626, ¶ 2. The Bank also
alleges that the Guarantors are in default on numerous covenants and agreements under the
Guarantees. *Id.* at ¶ 23. At trial, Schwartz was unable to clarify with any degree of certainty
whether the injunction applies to the Bank's loan with the Debtor as well as other loans and
obligations. (Tr. Vol. V, 1132.). Further, Schwartz acknowledged that the Guarantors have six
civil matters pending against them in a non-bankruptcy forum. In light of the foregoing, the
Court finds that the Guarantors Injunction provision is overly broad.

The Court also finds that Schwartz's proffered goal to protect the Guarantors from

-36-

"unnecessary litigation" is not tantamount to unusual circumstances that render the release terms important to the success of the plan. *See In re Ingersoll, Inc.*, 562 F.3d 856, 864-65 (7th Cir. 2009), citing *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005) ("A nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to the success of the plan . . . ."). The evidence establishes that none of the Guarantors have claims against the Debtor's estate, or the reorganized Debtor. (Tr. Vol. V, 1121). Schwartz's concern that the Debtor could be dragged into litigation involving the Guarantors is not warranted, as the Guarantors have no claims against the Debtor, at least none filed in this bankruptcy case. The Order Setting Deadline to File Proof of Claims in this case required that proofs of claims be filed on or before May 25, 2011. *See* Case No. 11-40944, dkt. no. 301. The Claims registry reflects no claims by the Guarantors against the Debtor, nor do the Debtor's schedules reflect such claims. Thus, the Court concludes that the Guarantors Injunction is not essential to the Debtor's reorganization. .

The Court declines to approve the Guarantors Injunction, especially where there is no evidence suggesting that the Guarantors will spend any time managing the reorganized Debtor. *See e.g. Gander Partners, LLC v. Harris Bank, N.A.*, (*In re Gander Partners, LLC*), 432 B.R. 781, 788 (Bankr. N.D. Ill. 2010 ) (noting that an injunction restraining creditors from proceeding against nondebtors is justified only if creditor actions in that regard would frustrate the Debtor's reorganization efforts by distracting the guarantors from reorganizing the debtor).

In *In re Gander Partners*, this Court observed that "A Section 105 injunction restraining creditors from proceeding against nondebtors is justified only if the creditor actions would interfere with, deplete or adversely affect property of a debtor's estate or which would frustrate the statutory scheme embodied in Chapter 11 or diminish a debtor's ability to formulate a plan of reorganization." 432 B.R. at 788. Courts recognize that the entry of an injunction may be

-37-

appropriate under the following circumstances:

>1. there be the danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize;
>
>2. there must be reasonable likelihood of a successful reorganization;
>
>3. the court must balance the relative harm as between the debtor and the creditor who would be restrained.
>
>4. the court must consider the public interest; this requires a balancing of the public interest in successful bankruptcy reorganizations with other competing societal interests.

*Id.* at 788 (citing *In re Monroe Well Service, Inc.*, 67 B.R. 746, 751-52 (Bankr. E.D. Pa. 1986)).

Here, the Court determines that there has been no showing of danger of imminent, irreparable harm to the Debtor's ability to reorganize. There is no reasonable likelihood of a successful reorganization, as the Debtor's financial projections are unreasonable. Balancing the harm as between the Bank and the Debtor, the Court finds that restraining the Bank is not justified because the Guarantors' time, money and energy are not directed toward the Debtor's reorganization. The public interest would not be served by issuing the Guarantors Injunction as the reorganization proposed herein is not likely to be successful.

## G.  Failure to Comply with Bankruptcy Code section 1122(a)

The Bank also objects to Confirmation because the Amended Plan treats the Bank's claim as fully secured, leaving it with no deficiency claim. Section 1122(a), which governs classification of claims or interests provides: "Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a).

-38-

Section 1122(a) does not mandate that a plan proponent classify similar claims together. However, it provides that dissimilar claims cannot be placed into the same class. *In re Loop 76, LLC,* 465 B.R. 525, 536 (B.A.P. 9th Cir. 2012). Although debtors are prohibited from separately classifying claims to "gerrymander an affirmative vote on reorganization, claims may be classified separately if significant disparities exist between the legal rights of the holder which render the two claims not substantially similar." *In re Wabash Valley Power Ass'n., Inc.,* 72 F.3d 1305, 1321 (7th Cir. 1995).

Section 506(a) governs the determination of secured status. That provision provides in part:

> (a)(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim.
> * * *

11 U.S.C. §506(a)(1).

Thus, the Bank has a secured claim to the extent of the value of the Property, and an unsecured claim as to any deficiency amount. Although the Bank has filed a proof of claim in the amount of $9,702,517.36, the parties have agreed that for purposes of confirmation and feasibility, the amount of the Bank's Claim is $10,200,000. *See* BANA Exhibit 7, Section IV , B, 1. In accordance with section 506(a), the Court determines the value of the secured portion of the Lenders claim to be $8,150,000. Thus, the unsecured portion is the Bank's claim is $2,050,000.

Here, the Debtor's Amended Plan fails to separately classify the unsecured portion of the

-39-

Bank's Claim in accordance with section 1122(a). *See In re SunCruz Casinos, LLC*, 298 B.R. 833, 837 (Bankr. S.D. Fla. 2003) ("While the statute itself deals with only the requirement that dissimilar claims may not be classified together, courts have uniformly held that it also prohibits separate classification of similar claims unless supported by legitimate business reasons."). Thus, the Amended Plan fails to satisfy section 1129(a)(1) which mandates that a plan comply with the provisions of the Bankruptcy Code. Had the Amended Plan placed the Bank's unsecured claim in an unsecured class, the Bank could have made the absolute priority objection. Even so, that objection lacks merit as noted above because holders of junior claims are not retaining property under the Amended Plan on account of junior claims.

### H.   The Plan is not proposed in good faith

The Bankruptcy Code requires that a debtor's plan be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3). Bankruptcy Court judges have broad discretion in determining whether a debtor's plan has been filed in good faith. *In re American Consol. Transp. Cos., Inc.*, 470 B.R. at 493. Good faith is "generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *203 N. LaSalle St. Partnership, 126 F.3d at 969, rev'd on other grounds* (internal citation omitted). Further, the plan must have "a true purpose and fact-based hope of either 'preserving going concern' or maximizing property available to satisfy creditors. *In re American Consol. Transp. Cos., Inc.*, 470 B.R. at 493.

The Bank argues that the Amended Plan is not proposed in good faith and asserts that the main focus of the Amended Plan is to protect the nondebtor Guarantors.

Schwartz testified that the main purpose of the Amended Plan is to stabilize the Property

-40-

and to pay off the Bank's claim. (*See* Tr. Vol. V, 999-1000) The evidence presented in these proceedings suggests otherwise. Rather than offer the new investment opportunity to third-party investors, which might have procured additional funds for the Debtor's cash reserve, Mr. Schwartz elected to condition his $250,000 new equity contribution upon the entry of a non-consensual Guarantors Injunction. In doing so, Schwartz effectively foreclosed the opportunity for third-party investors to provide a larger new equity contribution which could have been used to satisfy the Bank's claim. In light of these circumstances, the Court concludes that the Debtor's Amended Plan was not proposed in good faith.

**V.     The Bank's Motion for  Relief From Stay**

On August 27, 2012, the Bank filed a motion seeking relief from the automatic stay, pursuant to section 362(d) of the Bankruptcy Code. *See* dkt. no. 548.

That section provides in pertinent part as follows:

> On request of a party in interest and later notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay–
>> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>> (2) with respect to a stay of an act against property under subsection (a) of this section, if –
>>> (A) the debtor does not have an equity in such property; and
>>> (B) such property is not necessary to an effective reorganization . . .

11 U.S.C. § 362(d).

Generally, a secured creditor is entitled to relief from the automatic stay under section 362(d)(1) for "cause." Under section 362(d)(2), a secured creditor is entitled to stay relief if the debtor lacks equity in the property, and the property is not necessary for an effective reorganization. "To be 'effective,' a plan must be confirmable." *Edgewater Walk Apartments v. MONY Life Ins. Co. of Am.*, 162 B.R. 490, 498 (N.D. Ill. 1993). Thus, the confirmation

-41-

requirements of 11 U.S.C. § 1129 must be met. *Id.*

The Bank, as the moving party, bears the burden of proof on the issue of Debtor's equity in the Property. The Debtor bears the burden of proof on all other issues, such as whether the property is necessary to an effective reorganization. *Edgewater Walk Apartments,* 162 B.R. at 494, n.9. 11 U.S.C. § 362(g).

The Debtor must show that there "is a reasonable possibility of a successful reorganization within a reasonable time." *In re Caldwell Corners Partnership*, 174 B.R. 744, 759 (Bankr. N.D. Ill. 1994) (citing *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 376 (1988)). "This is known as the feasibility standard." *In re 8th Street Village L.P.*, 94 B.R. 993, 995 (N.D. Ill. 1988)

The Bank's Relief from Stay Motion is premised in part on the Debtor's inability to propose a confirmable plan of reorganization. As discussed in the Bank's objection to Plan confirmation, it asserts that the Debtor's Plan fails to met the requirements of Section 1129(a)(1), (7), (8) and (11) of the Bankruptcy Code. As discussed above in this opinion, Section 1129(a)(11) requires that the plan proponent establish that the Plan is feasible, that is, not likely to be followed by liquidation, the need for further financial reorganization, of the debtor or any successor to the debtor. 11 U.S.C. § 1129; *Sentinel Mgmt. Group, Inc.,* 398 B.R. at 317. The proponent of the plan bears the burden of establishing that the Plan is feasible by a preponderance of the evidence. *In re Repurchase Corp*, 322 B.R. at 342.

As discussed above, the Court finds that the Debtor has not established by a preponderance of the evidence that its Amended Plan is feasible.

The Debtor presented no credible evidence to support its contention that the Debtor will be able to finance the nearly $8.7 million balloon payment to the Bank at the end of the 7-year plan. The Court accords little weight to Detling's testimony that in year 2019, the Property will be worth $12,650,000 as his opinion is highly speculative in light of the Debtor's historic performance and existing economic conditions.

Further, the Amended Plan relies on highly speculative revenue projections, the achievement of which are not supported by the evidence. The Court also finds that the Debtor's cash flow projections, which govern the rental payments under the Master Lease, are overly aggressive and highly speculative. According to the Bank's feasibility expert, if the Property fails to meet its forecasted cash flow by 10%, it will lead to a substantial deficiency throughout the Plan term. *See* BANA Exhibit 2, p. 4; *In re Made in Detroit, Inc.*, 299 B.R. 170, 179-80 (Bankr. E.D. Mich. 2003) (denying confirmation of a plan where the proponent failed to show the ability to obtain financing). The evidence also establishes that at the conclusion of the confirmation hearing, the Debtor's sole tenant under the Master Lease Agreement, SE Copley, had yet to be capitalized. Thus, in the event the Debtor's Property is unable to perform according to the aggressive projections set forth in the Plan, the Debtor has not shown that SE Copley will have the cash reserves needed to satisfy its rental obligations to the Debtor.

The Court also finds that the Debtor has failed to prove the reasonable possibility of a successful reorganization within a reasonable period of time. The Debtor's Bankruptcy Case has been pending for over a year, and after two attempts, the Debtor has been unable to propose a confirmable Plan of Reorganization. Notwithstanding the length of time since the Petition Date, the Debtor has yet to obtain a letter of credit or the cash deposit pursuant to the Master Lease Agreement which was executed just 2 days before the commencement of the confirmation hearing.

-43-

Finally, the Court finds that the Debtor has failed to establish that there is equity in the Property. The Bank filed a proof of claim in the amount of $9,702,517.36. As noted above, the Court rejects the Debtor's valuation of the Property, and finds that the value for purposes of plan confirmation is $8,150,000, the figure proffered by the Bank. At that value level, and a claim amount of $9.7 million, there is no equity in the Property.

For those reasons, the Court determines that cause exists to lift the stay.

**VI.**    **Conclusion**

In sum, the Court denies confirmation of the Debtor's Amended Plan. The Debtor has failed to comply with Bankruptcy Code Sections 1122(a), 1127(c), and the cram down requirements of Section 1129(b).

The Bank's Motion for Relief from the automatic stay is GRANTED.

This opinion constitutes the Court's findings of fact and conclusions of law. Separate Orders will be entered consistent with this opinion.

Dated: January 10, 2013                    ENTER:

_____
Jacqueline P. Cox
U.S. Bankruptcy Judge