UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| GAC STORAGE LANSING, LLC, et al., | ) | Bankruptcy No. 11-40944 |
| | ) | (Jointly Administered) |
| | ) | |
| Debtor. | ) | Hon. Jacqueline P. Cox |
| | ) | |

Memorandum Opinion Denying Confirmation of GAC El Monte, LLC's Third Amended Plan of Reorganization and Granting Relief from the Automatic Stay (dkt. nos. 552, 613)

## I.  Jurisdiction and Venue

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  These are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(G) and (L). The Court has jurisdiction to determine these matters pursuant to 28 U.S.C. § 1334.

## II.  Facts and Background

This matter is before the Court for determination of Confirmation of the Third Amended Chapter 11 Plan of GAC Storage El Monte, LLC ("EL Monte" or the "Debtor"), Bankruptcy No. 11-42638. (See dkt. no. 613.)  The Debtor's case is being jointly administered with the Chapter 11 cases of GAC Storage Lansing, LLC (Case No. 11-40944), GAC Storage Copley Place, LLC (Case No. 11-40953), GAC Storage Anza, LLC (Case No. 11-48549), and San Tan Plaza, LLC (Case No. 48939) for administrative purposes under Lead Bankruptcy Case No. 11-40944.

The Debtor, formed on or about June 1, 2006, is a California limited liability company with its principal place of business located at 11310 Stewart St., El Monte, California (the "Property").  The Debtor is the owner and operator of a self-storage facility comprised of 2 buildings containing 126,000 square feet of storage space. (See dkt. no. 447.)

The Debtor is owned by GAC Storage, LLC ("GAC Storage"), which holds a 50% membership interest, and GAC Storage El Monte Holding Co., LLC ("El Monte Holding Co."), which holds the remaining 50% membership interest. El Monte Holding Co. is owned by JAND Investments; D.M.S.I., LLC; David Dahan & Yaffa Dahan; TAD 1993 Trust; Drorit Investments, Ltd.; Orit Sprecher; Ofra Kestenbaum; Erez Schwartz; Ronit Alkalay and Mike Mercer. GAC Storage is owned by D.M.S.I., LLC (74%), Sunset Storage Partners, LLC (25%), and Silver Valley Investments, LLC (1%). Ronnie Schwartz ("Schwartz") is the Secretary of Great American Capital, Inc., which is the Manager of D.M.S.I., LLC, and is the brother of Noam Schwartz. Ronnie Schwartz is also the holder of a beneficial interest of the TAD 1993 Family Trust[1]. (*See* Debtor's Exhibit B, Disclosure Statement, Section II, A, p. 2.)

In 2006, the Debtor obtained a construction loan in the amount of $11,900,000 from Lehman Brothers to finance construction of the Property. (*See* Debtor's Exhibit B, Section II, p. 2.) In February, 2008, the Debtor entered into a Loan Agreement with Wachovia Bank, N.A. ("Wachovia"), predecessor in interest to Wells Fargo Bank, N.A. ("the Bank"), in the amount of $12,650,000 (the "Loan") to refinance the original construction loan and to complete the construction and development of the Property. *Id.*

On September 8, 2010, Wachovia issued a Notice of Default and Election to Sell due to the Debtor's failure to pay the remaining balance of $12,041,222.25 by the loan's maturity date. *Id.* Shortly thereafter, the Supreme Court of the State of California, County of Los Angeles appointed Trigild Inc. as the receiver for the Property ("the Receiver"). The Receiver controlled the Property and operated the Debtor's business from September, 2010 until shortly after the Petition Date. (*See* Debtor's Exhibit B, Section II, A, p. 3 pp. 2-3; dkt. no. 487.)

On October 20, 2011, the Debtor filed a petition for relief under Chapter 11 of the

---

[1] The Court notes that the Debtor's Disclosure Statement references both a "TAD 1993 Trust" and a "TAD 1993 Family Trust" within the same paragraph. *See* Debtor's Exhibit B, Disclosure Statement, Section II, A, p. 2.

Bankruptcy Code (the "Petition Date").  Since the Petition Date, the Debtor has remained in possession of the Property, and has continued to operate its business as a debtor in possession pursuant to Bankruptcy Code ("Code") §§ 323, 1107, 1108.  Section 323 provides that the trustee is the representative of the bankruptcy estate and that he or she can sue and be sued.  11 U.S.C. § 323(a) and (b).  Pursuant to Section 1107, the Debtor has all of the rights and powers of a trustee in bankruptcy.  11 U.S.C. § 1107(a).   Section 1108 provides that the trustee may operate the debtor's business.  11 U.S.C. § 1108.

On June 28, 2012, the Bank filed its Proof of Claim in the amount of $12,436,929.19, which claim amount has been stipulated to by the parties. (*See* Bankruptcy Case No. 11-40944, Claim no. 3-3; dkt. no. 423, p. 2, ¶ C.)

### III.    The Debtor's Third Amended Plan

On September 27, 2012, the Debtor filed its Third Amended Chapter 11 Plan of Reorganization (the "Plan").  (*See* Debtor's Exhibit A, dkt. no. 613.)

### A.    The Bank's Claim

Class 2 of the Plan consists of the Bank's Claim in the amount of $8,000,000.  The Plan further provides that:

(i)    In the absence of the Bank making the Section 1111(b) Election, in full satisfaction of the Allowed Bank Secured Claim, the Allowed Bank Secured Claim shall be reduced by the total amount of the adequate protection payments made by the Debtor to the Bank since the commencement of the Case (the **"Adequate Protection Payment Reduction"**), and the Reorganized Debtor shall pay to the Holder of the balance of the Allowed Bank Secured Claim (less the Adequate Protection Payment Reduction): (i) from and after the Effective Date for the first twelve months thereafter, monthly interest payments **("Monthly Interest Payments")** on the unpaid balance of the Allowed Bank Secured Claim calculated

-3-

at 4.9% per annum, which Monthly Payments shall commence to accrue on the Effective Date, become payable on the fifth (5th) day of the first full month after the Effective Date (the **"First Payment Date"**), and continue to be paid on the same day of each month thereafter until the earlier of the date the Allowed Bank Secured Claim is paid in full or the First Anniversary Date; (b) monthly principal and interest payments ("Monthly Payments") on the unpaid balance of the Allowed Bank Secured Claim, based on a thirty (30) year amortization, with interest calculated at 4.9% per annum, which Monthly Payments shall commence to accrue on the First Anniversary Date, become payable on the fifth (5th) day of the first full month after the First Anniversary Date, and continue to be paid on the same day of each month thereafter until the earlier of the date the Allowed Bank Secured Claim is paid in full or the Maturity Date; and (iii) a balloon payment of the unpaid balance of the Allowed Bank Secured Claim plus any accrued and unpaid interest, which balloon payment shall occur and shall be due and payable on the Maturity Date.

(ii)     In the event of the Bank making the Section 1111(b) Election, in addition to the treatment provided in subsection (i) immediately above, the Bank shall also receive (a) fixed monthly payments of $6,666  (the "**1111(b) Payments**"), which payments shall commence on the First Payment Date, and continue to be paid on the same day of each month thereafter until the Maturity Date, and (b) a balloon payment of the unpaid balance of the Allowed Bank Claim, less the Adequate Protection Payment Reduction and less all payments made to the Bank under any provision of this Plan, which balloon payment shall occur and shall be due and payable on the Maturity Date.

**B.     The Master Lease Agreement**

The Plan also contemplates a 7-year Master Lease Agreement (the "Master Lease") which

-4-

was executed on November 12, 2012. *See* Debtor's Exhibit G, Master Lease Agreement. Pursuant to the Master Lease, GAC Storage EL Monte, LLC, as landlord, will lease its real estate and storage facility business to the tenant, SE El Monte Leasehold, LLC ("SE El Monte"), which will operate the storage Facility. SE El Monte, an affiliate of Storage, Etc., is a special purpose entity formed to be a party to the Master Lease. The Master Lease requires that SE El Monte provide a $1 million letter of credit, or cash deposit in the amount of $1,000,000 as security. *Id.*

The Master Lease provides that SE El Monte will pay the Debtor monthly rental payments equal to the amount of net operating income set forth in the Debtor's 7-year cash flow projections. Year one base rent starts at $46,825 per month and increases annually to coincide with the anticipated increase of the Debtor's net operating income through the end of the 7-year plan term. (*See* Debtor's Exhibit G, Schedule 1(i) Minimum Monthly Rental, p. 22.) Rent from the storage facility's tenants would effectively flow through the SE El Monte entity to the Debtor to fund the Debtor's payments to the Bank. In the event that the storage facility does not meet the cash flow projections, SE El Monte would draw from its operating reserve, which would be funded by that entity's capitalization.

The Master Lease is set to expire seven years after the rent commencement date.

### C.    The Guarantors Injunction

The Plan also calls for a $146,000 new equity contribution by Ronnie Schwartz, the sole member of Newco, the Reorganized Debtor, and a contribution by the Guarantors of the original loan in the amount of $100,000, both of which are contingent upon court approval of a Guarantors Injunction in the Plan. (*See* Disclosure Statement, Section 8.4, Exhibit B, p. 23, dkt. no. 487; Hearing Tr. Vol. V, 1004-05, December 6, 2012).

### D.    The Debtor's Balloting Report

The Debtor's Report of Balloting reflects that with respect to the Class 2 Bank Claim in the amount of $12,436,929.19, one vote rejected the Debtor's Plan. Three ballots were received in connection with Class 5 claims in the aggregate amount of $754.11 accepting the Debtor's Plan. One ballot was received in connection with Class 7 claims in the amount of $8,102 accepting the Debtor's Plan. (*See* Debtor's Exhibit E, Report of Balloting, dkt no. 541.)

The Bank elected to treat its claim as fully secured pursuant to 11 U.S.C. § 1111(b). (*See* Statement of Section 1111(b) Election, dkt. no 414.)

## IV.    Discussion

### A.    Plan Confirmation

11 U.S.C. § 1129 sets forth the requirements for confirmation of a chapter 11 Plan.  *See In re 203 N. LaSalle St. Partnership*, 126 F.3d 955, 960 (7th Cir. 1997), *rev'd on other grounds*, 526 U.S. 434 (1999). That section provides in pertinent part:

(a) The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

(2) The proponent of the plan complies with the applicable provisions of this title.

(3) The plan has been proposed in good faith and not by any means forbidden by law.

* * *

(b)(1)    Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a

plan, the court, on request of the proponent of the plan, shall confirm the plan

notwithstanding the requirements of such paragraph if the plan does not

discriminate unfairly, and is fair and equitable, with respect to each class of claims

or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable

with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides–

(i)(I) that the holders of such claims retain the liens securing such claims,

whether the property subject to such liens is retained by the debtor or

transferred to another entity, to the extent of the allowed amount of such

claims; and

(II) that each holder of a claim of such class receive on account of such

claim deferred cash payments totaling at least the allowed amount of such

claim, of a value, as of the effective date of the plan, of at least the value of

such holder's interest in the estate's interest in such property;

The plan proponent bears the burden of proving by a preponderance of the evidence that

each of the requirements of § 1129(a) are met. *In re Mayslake Village-Plainfield Campus, Inc*,

441 B.R.309, 316 (Bankr. N.D. Ill. 2010); *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr.

N.D. Ill. 2005).

## B. Feasibility of the Debtor's Third Amended Plan

Section 1129(a)(11), one of the Bankruptcy Code's feasibility standards, requires that:

"Confirmation of the plan is not likely to be followed by the liquidation, or the need for further

financial reorganization, of the debtor or any successor to the debtor under the plan, unless such

liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). "A bankruptcy

judge has an affirmative obligation to ensure that a plan of reorganization is feasible." *In re*

*Repurchase Corp.*, 332 B.R. 343.

"The feasibility requirement mandates that the plan proponent offer concrete evidence of sufficient cash flow to fund and maintain both its operations and its obligations under the plan." *In re American Consol. Transp. Cos., Inc.*, 470 B.R. 478, 489 (Bankr. N.D. Ill. 2012) (citing *Coones v. Mut. Life Ins. Co. of N.Y.*, 168 B.R. 247, 255 (D.Wyo.1994), *aff'd*, 56 F.3d 77 (10th Cir. 1995)). In determining feasibility, a plan proponent is not required to show that the plan is guaranteed to succeed. *In re 203 N. LaSalle St. P'ship*, 126 F.3d at 961-62. Rather, a reasonable assurance of commercial viability is required. *Id.* In making this determination, the court may examine: (i) the adequacy of the capital structure; (ii) the earning power of the business; (iii) economic conditions; (iv) the ability of the management; (v) the probability of the continuation of the same management and (vi); any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re U.S. Truck Co., Inc.* 800 F.2d 581, 589 (6th Cir. 1986).

### 1.    Value of the Property at the End of the Plan

Here, the Bank argues that the Plan fails to meet the feasibility standard of section 1129(a)(11) of the Bankruptcy Code because the Debtor cannot prove its ability to execute on a refinance or full payment sale by the maturity date. The Court agrees and finds that the Debtor has not established by a preponderance of the evidence that it will have the requisite financing to fund the final balloon payment.

The Bank has stipulated to the valuation of the Debtor's Property as $8.1 million. (*See* Hearing Tr. Vol. I, 9-10, Nov. 13, 2012.) The undisputed amount of the Bank's claim, as of the Petition Date, was $12.4 million. (*See* Stipulation, dkt. no. 423, p. 2, ¶ C.)

Thus, the key issue concerns the reliability of the prospective value figure which the Debtor proffers to be $9,600,000 in year 2019 and whether the Debtor has the ability to pay off

the Bank's claim after the balloon payment comes due through a refinancing or a sale. After due consideration of the evidence presented at trial, the Court determines that the Debtor has failed to prove that it will have the requisite means to pay off the Bank at the conclusion of its Plan.

The Debtor called Mr. Robin Detling ("Detling"), a commercial real estate appraiser for Colliers International to testify as its expert on valuation. Detling attended Brigham Young University where he received a bachelor's degree in management. In 2003, Detling joined Colliers International Valuation and Advisory Services where he serves as the managing director of its San Diego office. *See* Debtor's Exhibit S. Detling conducts appraisals for commercial income-producing real estate, including self-storage facilities. In 2010, he obtained an MAI (Member Appraisal Institute) Appraisal designation from the Appraisal Institute, which is their commercial real estate appraisal designation.

The MAI designation entails several hundred hours of professional education as well as submission of a sample demonstration appraisal report that is reviewed by peers in the appraisal industry. One third of his work consists of appraising self-storage and mixed used developments. As a licensed appraiser, Detling is required to follow the Uniform Standards of Professional Appraisal Practice ("USPAP"), which he testified he followed in connection with preparing the appraisal of the Property herein. Detling's valuation opinion for the Debtor's Property consists of a determination of the Property's as-is value, a 7-year prospective market value for the year 2019, the Hypothetical Market Value scenario and a liquidation analysis. (*See* Debtor's Exhibit R, Letter of Transmittal.) Detling testified that prior to this present case, he had never provided a prospective value opinion of 5 or more years for an existing storage facility. (*See* Hearing Tr. Vol. II, 361, Nov. 14, 2012**).**

Detling testified that he considered information on the Debtor's historical property performance, the building size, the percentage of income-producing units and rent rolls listing the tenants and the rent amounts paid. In addition, Detling conducted a physical inspection of the Property.

-9-

Detling's report notes that the analyses, opinions and conclusions communicated within were developed based upon the requirements and guidelines of the current Uniform Standards of Professional Appraisal Practice ("USPAP). An "Extraordinary Assumption" is defined by USPAP as "an assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraisers' opinions or conclusions." (*See* Debtor's Exhibit R, Letter of Transmittal.) No extraordinary assumption was made regarding the economy remaining stable throughout the 7-year Plan term. (*See* Tr. Vol. II, 383.)

Detling employed the income and sales comparison approaches to valuation for the appraisal and determined the Hypothetical Market Value to be $8,600,000, the as-is market value of the property to be $8,030,000 and the 7-year prospective value to be $9,600,000. (*See* Debtor's Exhibit R, Letter of Transmittal.) Under the Income Approach, Detling utilized the direct capitalization method, in which he analyzes the relationship of one year's stabilized net operating income to total property value. (*See* Debtor's Exhibit R, pp. 44-45). By definition, direct capitalization captures anticipated future benefits by capitalizing one year of net income at a rate that reflects all of an investors' expectations about the future performance of a property. (*See* Tr. Vol. II, 382.) It entails converting an estimate of stabilized net operating income into an indication of value by dividing it by an overall capitalization rate. As explained in Detling's report:

> the first step in the Direct Capitalization method is to estimate the subject's potential gross income. This process is accomplished through a comparison of the subject with similar properties having similar locations and utility. Vacancy allowance and operating expenses are deducted, based on market analysis. Finally, the resulting net operating income is capitalized at an appropriate supported rate.

*See* Debtor's Exhibit R, p. 45.

At the time of Detling's report, the physical occupancy of the Property was 62.5%. (*See*

-10-

Debtor's Exhibit R, p. 53.)

The $8,600,000 Hypothetical Market Value figure at Stabilization assumes that the Property is operating at a stabilized occupancy rate of 83%. (*See* Debtor's Exhibit R, p. 68.)  This figure also assumes that the Property is renting its storage units at market rate. (*See* Tr. Vol. II, 364-65.)

To achieve the as-is value opinion, Detling conducted a lease-up analysis over 24 months and deducted the costs that would be incurred to lease the Property from its current occupancy rate of 62.5% (Tr. Vol II, 237-38) to a stabilized occupancy rate of 83%.  (*See* Debtor's Exhibit R, p. 67.)  Detling applied deductions to provide for rental concessions that may have to be offered to promote occupancy and move-ins.  After deducting the absorption costs, Detling arrived at the as-is market value opinion of $8,030,000.  (*See* Debtor's Exhibit R, p. 68.)

To determine the 7-year prospective market value as of August 1, 2019,  Detling performed the direct capitalization method of the Property's projected net operating income. According to Detling's report he applied a growth rate of 3% to the rental and other income beginning in year 3, and a 3% growth rate to expenses.  (*See* Debtor's Exhibit R, p. 69.) The projected net operating income for the year following August 1, 2019 is $743,128.  (*Id.* at 69.) Detling then applied a prospective capitalization rate of 7.75%. The capitalization rate represents the relationship between the Property's net operating income and its market value. (*See* Tr. Vol. II, 267.)

His ultimate 7-year prospective value conclusion for this property as of August 1, 2019 is $9,600,000.  (*See* Debtor's Exhibit R, p. 69.)

The Debtor's Plan proposes to leave the majority of the Bank's claim unpaid until the end of the 7-year term, at which time it will pay off the $8,173,152 balance in full.  (*See* Debtor's Exhibit H, Revised Projections.) Thus, Detling's prospective value opinion of $9,600,000 is

-11-

offered to support the Debtor's assertion that it will have the requisite financing based on future value at the end of the Plan to pay the Bank's claim.

After giving due consideration to Detling's testimony and report, the Court finds that the Debtor has not shown that it will have the requisite financing to fund the balloon payment owed to the Bank at the end of the Plan's 7-year term. The overall lack of data supporting Detling's conclusions renders his valuation opinions unreliable and unhelpful to the Court.

The Debtor correctly notes in its response to the Bank's objection that there are no prohibitions on long-term plans. However, the Debtor is required to present credible evidence to the Court demonstrating that the balloon payment will likely be made by the Plan's maturity date. *See In re Mayslake,* 441 B.R at 317. As one court noted, "Whether that balloon payment can likely be made, and new financing acquired, requires credible evidence proving that obtaining that future financing is a reasonable likelihood." *In re Seasons Partners, LLC,* 439 B.R. 505, 515 (Bankr. D. Ariz. 2010); *See also U.S. v. Rader,* 2002 WL 1354714 (S.D. Ind. Apr. 17, 2002) ("Although plans requiring balloon payments are not necessarily unfeasible, courts view such plans with suspicion unless the debtor can show through definite and credible evidence that he will have the financial ability to make the balloon payment."). Here, the Court finds that the Debtor has not met that standard.

The Court found Detling's testimony concerning the methodology used and his adherence to the Appraisal Institute's recommendation when calculating a future value date to be inconsistent, and consequently damaging to his credibility. In particular, although Detling acknowledges The Appraisal Institute's recommendation for an "automatic" extraordinary assumption that relates to the potential changes between the current time, and the effective future value date to account for uncertainties in the future, he testified during cross examination that making such an assumption was unnecessary in this case. (*See* Bank's Motion in Limine, dkt. nos. 693, 708, Exhibit A, p. 9; Tr. Vol. II, 393-95.) Detling defended his decision in this regard by noting that his appraisal report applied annual growth rates of 3% to account for changes in

-12-

income and expenses. (*See* Tr. Vol. II, 393-94.) The Court questions Detling's reluctance to adhere to The Appraisal Institute's guidelines on future value when he testified on direct examination that he relied on the Appraisal Institute's instruction on advanced income capitalization.

The Court found the Bank's rebuttal real estate appraiser, Mr. David Michael Mason ("Mason"), to be persuasive. Mason received a Bachelor's of Science Degree in Business Administration from California State University in 1980. *See* Wells Fargo Exhibit 1, Tr. Vol. II, 422. Mason is an MAI and SRA designated member of the Appraisal Institute. *(See* Wells Fargo, Exhibit 1, p. 1; Tr. Vol. II, 422.) About 90-95% of Mason's work consists of commercial appraisals. Throughout his career he estimates that he has appraised 30-35 self-storage facilities. (*See* Tr. Vol. II, 429.) Mason taught real estate appraisal and real estate investment analysis courses at the University of Southern California for 12 years, and has taught a course entitled "The Standards of Professional Appraisal Practice" at the Appraisal Institute since 1990. (*See* Tr. Vol. II, 431.) Mason testified credibly that in his 25-year career, he has never made a value conclusion seven years in the future. (*See* Tr. Vol. II, 438-39.) He explained that such an opinion cannot be accurately forecasted and therefore will not be credible or trustworthy. *(See* Tr. Vol II, 446[2].)

For those reasons, the Court determines that the Debtor has failed to prove through its appraisal testimony that the Property will be worth $9,600,000 in seven years when the balloon payment becomes due. Accordingly, the Court finds that the feasibility standard of Section 1129(a)(11) has not been met.

### 2.  The Debtor's Plan is based on Unsupported Projections

Next, the Bank argues that the Plan is not feasible because it is based on unrealistic

---

[2]Debtor's objection to Mason's testimony regarding prospective value conclusions was taken under advisement by the Court. *See* Tr. Vol. II, 452.

projections. The Debtor in turn argues that the income generated by the reorganized Debtor under the Master Lease Agreement will be more than adequate to fund Plan payments to the Bank with a buildup of cash over the life of the Plan. (*See* Debtor's Response, dkt. no. 618, p. 6.) Further, the Debtor anticipates that the Bank's claim of $12.4 million will be paid down to approximately $8.2 million over the course of the Plan. (*See* Debtor's Exhibit H, Revised Master Lease Projections.)

The Debtor called Mr. Chris Lyons ("Lyons") to testify as a representative of Storage, Etc., a real estate company which owns, manages and develops self-storage properties. (*See* Tr. Vol. I, 16-17). Lyons has a Bachelor's of Science degree in Accounting from the State University of New York, at Fedonia and an MBA degree from the University at Buffalo. (*See* Debtor's Exhibit L, p. 3.) Lyons has been in the self-storage industry for 24 years and has served as Storage, Etc.'s Vice President for 12 years. *(See* Debtor's Exhibit L, p. 3, Tr. Vol. I, 20, 25.) On January 4, 2012, Storage, Etc. took over management of the Debtor's Property. (*See* Tr. Vol. I, 26-27; Debtor's Exhibit B, Section II, ¶ B, p. 4.) Lyons' testimony focused on his role in preparing the Property's Projections and the Plan's terms regarding the Master Lease.

The Debtor also called Mr. Kenneth Funsten ("Funsten") to testify as its plan feasibility and interest rate expert. Funsten received a Masters in Business Administration in finance and real estate from the University of Southern California and has over 20 years experience as a debt analyst, trader and portfolio manager. (*See* Debtor's Exhibit T, p. 31.) To prepare his report, Funsten reviewed the Debtor's Plan and Disclosure Statement, cash collateral budget, rent rolls, and conducted a site visit of the Property. He also relied on the figures and assumptions set forth in the Master Lease with Storage, Etc., and the appraisal report of Mr. Detling (Debtor's Exhibit T, p. 14), the Debtor's appraiser. (*See* Hearing Tr. Vol. III, 576-77, Dec. 4, 2012)

The Bank called Mr. Morris Aaron, CPA ("Aaron") as its plan feasibility and interest rate expert. Aaron received a Masters in Business Administration from Columbia University with a concentration in finance and management. Aaron is currently affiliated with the MCA Financial

-14-

Group, where he provides consulting and valuation services in the bankruptcy context. MCA has served as a trustee in bankruptcy cases and as a court-appointed receiver in cases in federal and state court. (*See* Hearing Tr. Vol. IV, 704-05, Dec. 5, 2012) Aaron estimates that he has testified as an expert in bankruptcy courts at least 20 times. (*See* Tr. Vol. IV, 707-08).

In his report, Aaron opined that the Debtor's Plan is not feasible due in part to the speculative and aggressive cash flow projections which are not consistent with the Debtor's current performance. He opined that the Plan fails to take into consideration factors such as anticipation of potentially declining future rental rates and additional rental rate concessions that may have to be offered to entice existing tenants to continue their tenancies. Further, Aaron observes that just a 10% deviation in the Debtor's revenue forecast will result in negative cash flows of ($1,052,456) and ($88,753) in years 1 and 2, and minimal cash flows in years 3 and 4. (*See* Wells Fargo Exhibit 7, p. 4, Report of MCA Financial Group, Ltd.) Aaron concludes that the Debtor's Plan provides for aggressive assumptions for the leasing of vacant space which are not in line with current market conditions. The Court agrees.

Beyond the annual rent increases and the addition of internet marketing, the Court heard little evidence to substantiate the significant growth projected in the Debtor's Plan. (*See* Debtor's Exhibit P.) While the Debtor's forecast provides for substantial increases in the Property's occupancy level, the Plan lacks detail as to how the Debtor plans to accomplish those figures. The evidence reveals that the Debtor's projections require a monthly average growth rate of 1.76 % during the first 8 months of the Plan term; the Debtor's historic performance does not support such growth. (*See* Debtor's Exhibit P.)

Further, the Court notes that although some of the Bank's concerns and the issues raised in Aaron's report have been addressed by the Debtor, such as the replacement of a non-binding letter of intent with the Master Lease agreement, many feasibility issues remain unresolved. The evidence presented at trial reveals that SE El Monte, the Debtor's tenant and sole source of income through the pendency of the Plan, had yet to be capitalized at the time of the confirmation

-15-

hearing. (*See* Tr. Vol. I, 86).  Further, Storage, Etc. had not obtained the letter of credit or the $1 million dollar security deposit due under the Master Lease. (*See* Tr. Vol. I, 86-87).  At trial, Lyons was unable to provide the name of a financial institution willing to provide a letter of credit, yet he was optimistic that one would be obtained. (*See* Tr. Vol. I., 87-88).  In the event that the storage facility is unable to achieve the net operating income projections which dictate SE El Monte's rental payments to the Debtor, there is no evidence that SE El Monte has sufficient capital reserves to fulfill its contractual obligations to the Debtor, leaving the Debtor without funds to make its payments to the Bank. When questioned on cross examination regarding the likelihood that Storage, Etc. would obtain these securities, Mr. Lyons merely expressed his confidence in obtaining the additional capital, stating that there were potential investors. (*See* Tr. Vol. I, 87-89.)  Unfortunately for the Debtor, such assurances absent concrete evidence are insufficient to establish that the terms set forth in its Plan are feasible. *See Chase Manhattan Mortgage & Realty Trust v. Bergman (In re Bergman)*, 585 F.2d 1171, 1179 (2d Cir. 1978) ("Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises.").  Here, the scarcity of such vital information is fatal to the Debtor's Plan, as the rental income under the Master Lease Agreement is the sole source of funding for the Debtor's Plan**.**

Accordingly, the Court finds that the Debtor has not met its burden of showing that the Plan is feasible under 11 U.S.C. § 1129(a)(11), which requires, in part, that confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor or any successor to the debtor under the Plan.

**C.      The Cram Down Requirements of Section 1129(b)**

The Bank also objects to Confirmation of the Plan because the Debtor's proffered interest

-16-

rate of 4.88% (rounded up to 4.9% in the Plan) does not adequately reflect the risk of non-payment and submits that an appropriate rate of interest for the Bank's claim is at least 8.6 %. It contends that the Plan's treatment of the Bank's claim violates the fair and equitable test and for that reason confirmation of the Plan should be denied.

Section 1129(b) provides that a plan that satisfies the requirements set forth in 1129(a), except for subsection (a)(8), may be confirmed over a creditor's objection, if the plan does not discriminate unfairly between impaired classes and is fair and equitable to the class of creditors that have rejected the plan. 11 U.S.C. § 1129(b)(1). *In re Mayslake*, 441 B.R. at 316. This is commonly referred to as the Bankruptcy Code's "cram down" provision.

Where the plan provides for the retention of the creditor's collateral, the condition that the plan be fair and equitable with respect to a class includes the following requirements: i) that the plan provides that the creditor retains its lien on the collateral; and ii) that the creditor receives deferred cash payments equal to the present value of the allowed claim. 11 U.S.C §1129(b)(2)(A). Further, the plan or reorganization cannot unfairly shift the risk of a plan's failure to the creditor. *In re Monarch Beach Venture, Ltd.*, 166 B.R. 428, 436 (C.D. Ca. 1993).

Accordingly, the Debtor's Plan must propose an interest rate adequate to assure the realization of the Bank's claim, which for purposes of confirmation, is $12.4 million. *See In re Bloomingdale Partners, LLP*, 155 B.R. 961, 977 (Bankr. N.D.Ill. 1993).

While the Debtor bears the burden of proof on plan confirmation issues, the Bank bears the burden of establishing that an additional risk adjustment is necessary. *See In re American Consol. Transp. Cos., Inc.* 470 B.R. at 487; *Till v. SCS Credit Corp.*, 541 U.S. 465, 484-85 (2004) ("[T]he formula approach, which begins with a concededly low estimate of the appropriate interest rate and requires the creditor to present evidence supporting a higher rate, places the evidentiary burden on the more knowledgeable party, thereby facilitating more

accurate calculation of the appropriate interest rate.")[3].

## 1. Determination of an Appropriate Rate of Interest

The Court finds that the interest rate asserted by the Debtor fails to capture the risk of nonpayment inherent in its Plan and concludes that 8.6% is an appropriate rate of interest given the Debtor's circumstances.

In support of its proffered rate, the Debtor called Mr. Kenneth Funsten ("Funsten"), CFA to testify as its expert interest rate analyst. He ultimately concluded that the interest rate of 4.88% was adequate. (*See* Tr. Vol. III, 524.)

Funsten opined that no market exists for the Loan, as the Debtor's Property is over-leveraged with a Loan to Value ratio of 97% which is above the level at which commercial banks make loans. (*See* Debtor's Exhibit T, pp. 14, 16). Therefore, Funsten followed the Blended Rate Approach, which he describes as a *"Till*-guided" formulaic method, and concluded that 4.88 % is an appropriate rate of interest for this loan as required by section 1129(b)(2)(A). (*See* Debtor's Exhibit U.)

Funsten explains that the Blended Rate Approach entails dividing a single loan into a series of risks, or tranches, and then using weighted factors to evaluate each risk's appropriate interest rate before "blending" those rates together into a single interest rate. (*See* Debtor's Exhibit T, p. 20.) The Blended Rate Approach fixes how much of a plan's proposed new loan deserves an interest rate of prime (the "A" tranche, or the conforming loan piece) and how much of the new loan deserves an interest rate substantially higher than prime (the "B" tranche). This approach gives degrees of risk their own interest rate, their own risk-rates, and then weighs and

---

[3]Compare with *In re DeTienne Assocs. L.P.,* 2005 Bankr. LEXIS 3122, *18-19 (Bankr. D. Mont. 2005*), where a bankruptcy judge opined that the burden of satisfying the cramdown requirements under section 1129(b) remain with the debtor despite the Supreme Court's decision in *Till v. SCS Credit Corp.*

reblends the results to determine a single number. (*See* Debtor's Exhibit T, p. 21.) Funsten first assigned the prime rate of 3.25% to the A tranche. To the B tranche, he assigned a blended interest rate of 8.18%. (*See* Debtor's Exhibit U, p.1.) The Blended rate totals 4.88% which Funsten asserts is the appropriate rate of interest.

In his report, Funsten provides a narrative of the collateral, the capacity, plan circumstances and property characteristics (commonly referred to as the four C's of Credit) that were considered in formulating his interest rate conclusion. (*See* Debtor's Exhibit T, Section F, pp. 14-15.) This analysis is intended to capture certain risks, or positive factors that may exist for a particular loan. (*See* Tr. Vol. III, 608-09). Funsten noted in his report that the marketing efforts by the Debtor, and its manager, Storage, Etc., have resulted in improved financial results which are expected to continue to improve in the future. (*See* Debtor's Exhibit T, Section E, p. 13).

In the collateral portion of his analysis, Funsten describes the Debtor's loan-to-value ratio of 97% as "not great," but opines that the Debtor is moving in a positive direction and weighs the collateral factor as neutral. (*See* Debtor's Exhibit T, Section F, p. 14).

As to the Debtor's ability to pay pursuant to the Plan terms, Funsten opines that given the Debtor's cash on hand and the anticipated contribution for the Payment Reserve, the Reorganized Debtor will be able to service its debt obligations. (*See* Debtor's Exhibit T, Section B, p. 6 & Section F, p. 14.)

In his discussion of property characteristics, Funsten expressed that the diversity of the Debtor's cash flow, with over 1000 tenants, was one of the positive aspects of the Debtor's Plan. (*See* Debtor's Exhibit T, p. 15.) He explained that this characteristic has a "more certain prospect of creditor repayment than other smaller, less diversified properties." *Id.* As noted above, however, the Debtor has since amended its Plan to provide for one master tenant, SE El Monte, pursuant to the Master Lease.

Funsten defended his interest rate opinion by explaining that because appraisals by nature reflect the risk that the borrower may not be able to perform, care must be taken not to "double-count," thereby artificially increasing the Debtor's risk and the Property's risk. *(See* Debtor's Exhibit T, p. 17.)

The Bank countered that an interest rate in excess of the 4.88% per annum was necessary to provide it with the present value of its secured claim and argued that 8.6% is an appropriate rate of interest. (*See* Wells Fargo, Exhibit 7, pp. 3, 8.)

Under both approaches, Aaron assumes that the Debtor's valuation of the Property is correct, and assumes that the loan-to-value rate is in excess of 100%. (*See* Wells Fargo Exhibit 7, p. 6.) According to Aaron's report, the Formula Approach consists of a base rate, plus additional factors to compensate for risks associated with a specific borrower or terms of repayment. He explains that his risk analysis is dependent upon risk factors such as i) default risk; ii) security risk and iii) interest rate risk. (*See* Wells Fargo, Exhibit 7, p. 6.)

Under the formula approach Aaron began, as did the Debtor's expert, with the prime rate of 3.25 %. (*See* Wells Fargo, Exhibit 7, p. 6.) However, Aaron assigns an additional security and default risk adjustment of 2.50 % to account for the additional default risk that the Debtor will be unable to make the payments under the Plan. (*See* Wells Fargo, Exhibit 7, p. 7.) Aaron makes this risk adjustment because in his view, the Property's neighborhood and location presents an additional risk of depressed rental rates and occupancy both now and in the future. (*Id.* at 7.) Aaron next assigns a 1% risk adjustment as the interest rate risk for the 7-year term of the Debtor's loan. Interest rate risk is the risk a lender takes by providing fixed financing while its cost of capital is variable and compensates the lender for the future risk that interest rates will increase over time. (*See* Tr. Vol. IV, 728). He explains that the interest rate risk adjustment is necessary because the Debtor's Plan exceeds the conventional 3-year term; this adjustment compensates the Bank for fluctuations in interest rates over the course of the Debtor's 7-year Plan term. (*See* Wells Fargo, Exhibit 7, pp. 3, 7.)

-20-

Aaron next applied a 2% adjustment to account for security and default risk for a loan above a 65% to 90% loan-to-value ratio. For his analysis, Aaron assumes a loan-to-value ratio of 100%, which indicates significant additional security risk to the Bank as there is no equity cushion. *(See* Wells Fargo, Exhibit 7, pp. 6-7.) Aaron explains that 2% is an appropriate risk adjustment because this is the riskiest piece of the Debtor's loan and it compensates the lender for the risk of nonpayment. Thus, 2% is added to 6.75% to arrive at an interest rate of 8.75 %. Aaron then applies a weighted interest calculation to portions of the loan amount to arrive at the appropriate rate of interest of 8.6% (rounded). (*See* Wells Fargo Exhibit 7, p. 8.) A chart illustrating Aaron's build-up rate approach has been reproduced below:

|  | Rate Build Up |
|---|---|
| Prime Rate | 3.25% |
| Security & Default Risk – | 2.50% |
| | |
| Interest Rate – conforming 65% LTV, 3-year term | 5.75% |
| Interest Rate Risk for 7-year term | 1.00% |
| | |
| Interest Rate– conforming 65% LTV, 7-year term | 6.75% |
| Security & Default Risk for loan above 65% to 90% LTV | 2.00% |
| Interest Rate for portion above 65% to 90% LTV | 8.75% |

*See* Wells Fargo, Exhibit 7, p. 8.

Aaron next employed the market survey approach, whereby market lenders are surveyed to determine the terms lenders offer to the very best borrowers under conforming loan conditions. (*See* Bank's Exhibit 7, pp. 8-9.) The market survey approach is a separate analysis used to verify the reasonableness of the assumptions in the formula rate approach. (*See* Wells Fargo, Exhibit 7, p. 9.) This approach consists of a survey of lenders to determine a) if a market for the Debtor's loan exists; and b) the current market rate of interest if such a loan were available to the Debtor. *(See* Wells Fargo, Exhibit 7, p. 6.) Aaron testified that he uses the market survey approach to verify that the assumptions made under the formula approach are accurate. (*See* Tr. Vol. IV, 719-20.)

In opining on the Debtor's proposed interest rate, Aaron testified that the Debtor's expert

failed to account for the risks associated with the Bank's claim. (*See* Tr. Vol. IV, pp. 746-750.)
He opined that the interest rate proposed by the Debtor is not the appropriate interest rate given
the Plan's proposed repayment terms, the risk inherent in the Plan, the current occupancy and
cash flow levels of the property as well as current market conditions. (*See* Wells Fargo, Exhibit
7, pp. 2-3.)

### 2.       The Bank's proffered Rate of Interest

Although both experts contend they followed the guidelines noted in the Supreme Court's
plurality decision in *Till v. SCS Credit Corp.*, the Court finds that the interest rate proffered by
the Debtor does not include adequate risk adjustments given the circumstances of the Debtor's
Plan.

In *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), the Supreme Court opined on the
correct approach for selecting an appropriate rate of interest for cramdown in the Chapter 13
context. There, the plurality concluded that a "prime plus" formula rate approach, which is based
upon the prime rate of interest, best carries out Congress' intent for the Bankruptcy Code
provisions that require discounting to present value. 7 COLLIER ON BANKRUPTCY ¶ 1129.06[1][c]
(Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.).  Speaking for the plurality, Justice
Stevens opined that "[t]he resulting 'prime plus' rate of interest depends only on the state of
financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan,
not on the creditor's circumstances or its prior interactions with the debtor." *Till*, 541 U.S. at
479.  While declining to decide the scale for risk adjustment, the Court noted that other courts
generally approved adjustments of 1% to 3%. *Id.* at 480. The Court went on to note that the
cramdown requirement "obligates the court to select a rate high enough to compensate the
creditor for its risk but not so high as to doom the plan. If the court determines that the likelihood
of default is so high as to necessitate an "eye-popping" interest rate, the plan probably should not
be confirmed." *Id.* at 480-81.

Here, the Court finds that the circumstances of the Debtor's Plan and the characteristics
of the loan indicate that a 1% to 3% risk adjustment does not adequately compensate the Bank
for all of the risks it faces. The Debtor's expert provided a cursory review of the collateral,
capacity, plan circumstances and property characteristics he considered in his analysis. However,
it is not clear from his report or from his testimony at trial that those risks were actually provided
for in his ultimate interest rate conclusion.

The Court finds that Aaron's report by contrast more aptly evaluates all of the risks in
light of the circumstances of the Debtor's Plan. Mr. Aaron identified and explained the specific
risk factors of the Loan and applied a series of rates using a formula approach. His report
provides a detailed study of the Debtor's Plan, the projections therein, and the risks inherent
given those figures. Aaron provides a well-reasoned analysis of the build-up approach, in which
he begins with a prime rate of 3.25%, and assigns additional rate adjustments to account for the
Debtor's non-conforming self-storage building loan with a loan to value ratio of 65%, to account
for specific risk factors associated with the 7-year plan. Aaron then conducted a market survey to
ensure that his interest rate conclusion was consistent with rates in the appropriate market.

Aaron testified credibly that Funsten's interest rate analysis failed to sufficiently capture
the risks of default. In particular, the Court found Aaron's criticism of Funsten's decision to
assign the prime rate of 3.25% to the A tranche of the Debtor's Loan to be especially convincing.
Aaron explained that although the prime rate of interest does have some amount of built-in
default security risk, that low rate of interest is generally reserved for a mature, stabilized
property. (*See* Tr. Vol. IV, 746-748.) He noted that because of the Property's low occupancy
rate and the overall competition in the market, a higher interest rate is warranted. (*See* Tr. Vol.
IV, 747-48.) Aaron also takes exception to Funsten's methodology in calculating the second, or
B tranche of the Loan, remarking that Funsten failed to sufficiently account for the Debtor's
specific asset and risks. (*See* Tr. Vol. IV, 748-49.) Finally, Aaron notes in his report that an
interest rate of 8.6% represents the lowest supportable rate for the repayment of the Bank's
secured claim. (*See* Wells Fargo, Exhibit 7, pp. 2-3.)

-23-

Accordingly, the Court finds that the interest rate advanced by the Debtor does not sufficiently capture the risk that the Debtor will not satisfy the Bank's claim. The 8.6% interest rate conclusion submitted by the Bank is supported by the data provided in Aaron's report and the evidence presented at trial.

### D.    Disclosure Requirements

The Bank also complains that the Plan cannot be confirmed because the Debtor has not complied with the disclosure requirements of section 1127 of the Bankruptcy Code.

Section 1127(a) provides that the proponent of a plan may modify a plan at any time before confirmation. 11 U.S.C. § 1127(a). However, the plan proponent must also satisfy the disclosure requirements of section 1125 with respect to the plan, as modified. *See* § 1127(c). 11 U.S.C. § 1125 provides:

(a) In this section–

> (1) "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information . . . .

The purpose of a disclosure statement is to provide creditors the information

-24-

they need to decide whether to accept or reject the debtor's plan. The determination of whether the disclosure statement contains adequate information is made on a case-by-case basis under the facts and circumstances presented. *In re Scioto Valley Mortgage Co.,* 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988).

Upon review of the Plan, it is clear that the Debtor has not complied with the disclosure requirements of Section 1125 as the Debtor has failed to provide sufficient information regarding the recently executed Master Lease Agreement and the circumstances of the tenant under the agreement, SE El Monte. Because the rental income due the Debtor under the Master Lease Agreement is the sole source of funding for the Plan, the Court finds it critical that this information be included so that creditors can make an informed decision on whether to vote for the Plan. As noted by the Bank in its Supplemental Objection, the Plan is devoid of information concerning the financial condition of the newly formed tenant entity, SE El Monte, its parent Storage, Etc., and the business relationships between the Master Lease tenant, the Debtor, and its guarantors. (*See* dkt. no. 631, p. 4.)

Accordingly, the Court concludes that the Debtor's Plan fails to comply with the disclosure requirements of Sections 1125 and 1127.

In a related objection, the Bank also argues that the Plan does not satisfy Section 1129(a)(5) of the Bankruptcy Code because it does not provide information regarding post-confirmation management of the Reorganized Debtor.

Subsection 1129(a)(5)(A)(i) requires that:
The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan . . . .
11 U.S.C. § 1129(a)(5)(A)(i).

-25-

The Court notes that the Debtor's Disclosure Statement provides some indication of the management structure of the Reorganized Debtor. It discloses that none of the Debtor's current owners, or Guarantors of the Bank's claim will have an ownership interest in the Reorganized Debtor. (*See* Debtor's Disclosure Statement, dkt no. 487, Section III. A, p. 5.) However, because Ronnie Schwartz will be the sole owner of the Reorganized Debtor, and he has an interest in the TAD 1993 Family Trust, which owns part of GAC El Monte Holding Co. (a 50% owner of the Debtor), making him a current indirect owner of the Debtor, it would be reasonable to question the statement that no current owner of the Debtor will be an owner of the Reorganized Debtor. The Court also notes that the Plan is silent as to the management structure of the Reorganized Debtor. According to Mr. Schwartz's testimony at trial, he intends to bring on either himself or an entity which he would control as the manager of Newco and that the manager would have a 1% ownership interest in Newco. This information is not noted in the Debtor's Plan. Without that disclosure, creditors have no way of knowing this before they vote on the Plan. Debtor's failure to supply this information is a violation of section 1129(a)(5)(A)(i).

### E.    The Absolute Priority Rule

The Bank also objects to confirmation of Debtor's Plan under the "absolute priority rule." It argues that because the Plan proposes to transfer the equity interests of the Debtor to certain insiders, it allows the current principals to determine who will own equity of the Reorganized Debtor and how much they will pay. The Court agrees.

Section 1129(b)(1)(B) provides that:

> (B) With respect to a class of unsecured claims–
>     (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest in any property. . . .

11 U.S.C. § 1129(b)(2)(B).

Under the "absolute priority" rule, claims of any objecting impaired class must be paid in full before a class of claims junior to it is allowed to retain any interest under a Chapter 11 plan. *See* 11 U.S.C. §1129(b)(2)(B)(ii). The rule prohibits insiders of the debtor and current holders of equity from retaining any interests or property on account of their equity interests unless senior classes are paid in full. *In re Castleton Plaza, LP, No.* 12-2639, 2013 WL 537269 (7th Cir. Feb. 14, 2013). The absolute priority rule is one of the conditions of the "fair and equitable" standard necessary for cram down of a proposed Chapter 11 plan over objection of an impaired creditor. *In re Sentinel Mgmt. Group, Inc.* 398 B.R. 281, 319 (Bankr. N.D. Ill. 2008). Where one or more classes of claims entitled to vote reject the plan, any member of the rejecting class may file an objection to confirmation of the plan based on any alleged violation of the absolute priority rule.

The Bank posits that the "insider nature" of the Plan warrants application of the absolute priority rule and that Schwartz formulated the Plan primarily for his own benefit, and for the benefit of Noam Schwartz, Yoel Iny and their families. The Debtor responds that applying the absolute priority rule in this case violates the plain meaning of the statute, as the Debtor's Plan does not involve the transfer of "old equity." The Court finds that the Bank has the better argument.

In *Bank of America Nat. Trust and Sav. Ass'n. v. 203 North LaSalle St. P'ship*, 526 U.S. 434, 454 (1999), the Supreme Court held that a debtor's plan violated the absolute priority rule by "vesting equity in the reorganized business in the debtor's partners without extending an opportunity to anyone else either to compete for that equity or propose a competing reorganization plan." The Seventh Circuit recently addressed this issue in *In re Castleton Plaza,*

-27-

*LP.* In the underlying bankruptcy case in *Castlelon*, the debtor's chapter 11 plan provided that 100% of the equity in the reorganized debtor would go to the wife of the debtor's owner, who would invest $75,000 (increased to $375,000). The Court of Appeals held that plans giving insiders preferential access to investment opportunities in a reorganized debtor should be subject to the same opportunity for competition as plans in which existing claim-holders put up new money. Thus, "[a]n impaired lender who objects to *any* plan that leaves insiders holding equity is entitled to the benefit of competition." *Id.* at *3. An "insider" is defined by the Bankruptcy Code as follows:

> If the debtor is a corporation–
> > (i) director of the debtor;
> > (ii) officer of the debtor;
> > (iii) person in control of the debtor;
> > (iv) partnership in which the debtor is a general partner;
> > (v) general partner of the debtor; or
> > (vi) relative of a general partner, director, officer, or person in control of the debtor . . . .

*See* 11 U.S.C. § 101(31)(B).

The current ownership structure of the Debtor is as follows: The Debtor is owned by GAC Storage which holds a 50% membership interest, and GAC Storage El Monte Holding Co., which holds the remaining 50% membership interest. GAC Storage is owned by D.M.S.I., LLC (74%), Sunset Storage Partners, LLC (25%), and Silver Valley Investments, LLC (1%). GAC Storage El Monte is owned by JAND Investments, D.M.S.I., LLC, David Dahan & Yaffa Dahan, TAD 1993 Trust, Drorit Investments, Ltd., Orit Sprecher, Ofra Kestenbaum, Erez Schwartz, Ronit Alkalay and Mike Mercer. Ronnie Schwartz is the Secretary of Great American Capital, Inc., which is the Manager of D.M.S.I., LLC. Ronnie Schwartz, who will be the sole and managing member of the Reorganized Debtor, holds a beneficial interest in the TAD 1993

Family Trust. (*See* Debtor's Exhibit B, Section II. A, dkt. no. 487, p. 2.)

Given the ownership structure of the Debtor, it is clear that Schwartz is an insider within the meaning of Section 101(31)(B)(iii) as a person in control of the Debtor. He is a partial owner of GAC Storage through the TAD 1993 Family Trust in which he holds a beneficial interest (*See* Tr. Vol. V, 1028). Schwartz is also the brother of Noam Schwartz, who signed as the authorizing individual on the Debtor's Petition. (*See* Bankruptcy Case No. 11-42638, dkt. no. 1.) The evidence reveals that Schwartz is a person in control of the Debtor, as he testified that he is a shareholder of Great American Capital (a 50% owner of the Debtor) and that he was principally responsible for negotiating the Debtor's role in the Master Lease. (*See* Tr. Vol. V, 1028, 1059.) The Debtor's Plan contemplates the issuance of 100% of the equity in the Reorganized Debtor to be owned entirely by Schwartz, in exchange for a new equity contribution of $146,000. In light of the *Castleton* decision, the Court determines that the absolute priority rule applies, despite the fact that Schwartz is not a direct owner or investor. The Debtor's Plan proposes to give Schwartz, an insider of the Debtor, preferential access to an investment opportunity in the Reorganized Debtor and is therefore subject to competitive bidding, as the holding in *Castleton* instructs.

F.     **The Guarantors Injunction**

The Bank objects to the inclusion of the Guarantors Injunction, which it contends is not essential to the Debtor's Plan and improperly deprives it of its bargained for state law rights under the Loan Guaranties.

The proper standard for approval of a release in a plan of reorganization in favor of a non-debtor third party is that the provision be narrowly tailored and essential to the reorganization plan as a whole. *See In re Ingeroll, Inc.*, 562 F.3d 856, 864-65 (7th Cir. 2009); *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 657 (7th Cir. 2008).

The Court has to determine whether the injunction in question is appropriate for the Debtor's Plan. The Court determines that it is not.

The release at issue herein provides as follows:

> Guarantors Injunction. In consideration for Newco funding the New Equity Contributions
> and the Guarantors funding the Guarantor Contributions, entry of a Confirmation Order
> will operate as an injunction against the commencement or continuation of an action, the
> employment of process, or any act to collect, recover or offset any Claim of any Holder
> against the Guarantors under the Bank Loan Documents or otherwise, which Guarantors
> Injunction shall be effective so long as the Reorganized Debtor is performing its
> obligations under the Plan and no Default has occurred.

*See* Debtor's Exhibit A, Third Amended Chapter 11 Plan, p. 24, Article VIII, Section 8.4, dkt.
no. 613.

The Guarantors of the Loan Documents are: Noam Schwartz, Rachel Elmalam, Noam

Schwartz Living Trust, Yoel Iny, Tikva Iny, and the Y & T Iny Trust. (*See* Debtor's Exhibit A,

Article 1.1.42, p. 5; dkt. no. 613.) The inclusion of the Guarantors Injunction is a condition

precedent to the $146,000 New Equity Contribution and the Guarantors' contribution of

$100,000 to the Plan.  Schwartz, who will be the sole member of the Reorganized Debtor,

testified that he will contribute the capital only if the Guarantors Injunction is approved. He also

testified that this amount would be placed into a reserve account, untouched until the Bank's loan

was paid off.  He explained that this reserve would be used for unknown expenses, or shortfalls

to take care of monthly payments to the Bank.  The Guarantors Injunction is characterized by

Schwartz as a "temporary injunction."

Schwartz testified that the provision is necessary because of concerns that the Bank

would initiate unnecessary litigation against the Guarantors. (*See* Tr. Vol. V, 926, 965.)

Schwartz was unable to articulate any sound business reasons for including this provision or why

the success of the Plan is contingent upon its inclusion.  Schwartz testified that he made no

efforts to solicit third party equity contributions in lieu of the injunction because he was unaware

of any capital market that would be willing to come into such an uncertainty. (*See* Tr. Vol. V,

1071-72.)

In support of the proposed Guarantors Injunction, the Debtor relies on the Seventh

Circuit's decision *In re Airadigm Commc'ns, Inc.*  In *Airadigm*, the court considered whether a

bankruptcy court has the authority to release a non-debtor third party from creditor liability over the creditor's objection. The court ultimately held that such a release is "appropriate," but explained that "[w]hether a release is 'appropriate' for the reorganization is a fact intensive inquiry and depends on the nature of the reorganization. *Airadigm*, 519 F.3d at 657. For the release at issue in that case, the court first determined that the limitation itself was narrow, in that it applied only to claims "arising out of or in connection with" the reorganization itself; next the court determined that "the limitation is subject to the other provisions of the plan; and third, there was 'adequate' evidence that the financier of the plan "required the limitation before it would provide the requisite financing, which was itself essential to the reorganization." *Id.* at 657. *See also In re Berwick Black Cattle Co.*, 394 B.R. 448, 459 (Bankr. C.D. Ill. 2008) ("The release at issue in *Airadigm* was nothing more than the kind of narrowly tailored release that is customary in Chapter 11 plans . . . [N]evertheless, it was not simply rubber stamped by the Seventh Circuit, which applied a three-part analysis.")

The bankruptcy court in *In re Berwick Black Cattle Co.* denied confirmation of a plan that included a blanket third party release provision. 394 B.R. at 457. The release at issue in that case covered pre-petition claims and claims that were unrelated to the bankruptcy proceedings. The court held that such releases went well beyond what the Seventh Circuit approved in the *Airadigm* decision, as they purported to release from liability third parties in a non-bankruptcy suit over which the court had no jurisdiction. *Id.* at 462.

Here too, the Court finds that the Guarantors Injunction is overly broad. The Guarantors Injunction at Section 8.4 of the Plan purports to enjoin the Bank from the "commencement or continuation of an action, the employment of process, or any act to collect, recover or offset any Claim of any Holder against the Guarantors under the Bank Loan Documents *or otherwise*, which Guarantors Injunction shall be effective so long as the Reorganized Debtor is performing its obligations to the Bank under the Plan and no Default has occurred." (Emphasis added). The provision is not narrow in scope, as the clause "or otherwise" seems to categorically enjoin the Bank from pursuing its contractual remedies against the Guarantors for other loans that the Bank has with the Guarantors herein. The Bank rightfully has cause for concern given this broad

-31-

language, as the Guarantors have additional obligations under other loan documents. (*See* dkt. no. 631, Submitted by Wells Fargo, p. 9, ¶ 23.) The Bank also alleges that the Guarantors are in default on numerous covenants and agreements under the Guarantees. (*Id.* at ¶ 23.) Further, Schwartz acknowledged that the Guarantors have at least 7 civil matters pending against them. (*See* Tr. Vol. V, 1076-77). In light of the foregoing, the Court finds that the Guarantors Injunction provision is overly broad.

The Court also finds that Schwartz's proffered goal to protect the Guarantors from unnecessary litigation is not tantamount to unusual circumstances that render the release terms important to the success of the plan. *See In re Ingersoll, Inc.*, 562 F.3d 856, 864-65 (7th Cir. 2009), citing *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005) ("A nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to the success of the plan . . . ."). The evidence establishes that none of the Guarantors have claims against the Debtor's estate, or the reorganized Debtor. Nor will the Guarantors be involved in managing the reorganized Debtor. (*See* Tr. Vol. V, 966-67.) Schwartz's concern that the Debtor could be dragged into litigation involving the Guarantors is not warranted, as the Guarantors have no claims against the Debtor, at least none filed in this bankruptcy case. The Order Setting Deadline to File Proof of Claims in this case required that proofs of claims be filed on or before June 29, 2012. (*See* Case No. 11-40944, dkt. no. 356.) The Claims Registry reflects no claims by the Guarantors against the Debtor, nor do the Debtor's schedules reflect such claims. Thus, the Court concludes that the Guarantors Injunction is not essential to the Debtor's reorganization.

Further, the Court declines to approve the Guarantors Injunction because there is no evidence suggesting that the Guarantors will spend any time managing the reorganized Debtor (*See* Tr. Vol V, 1076.) *See e.g. Gander Partners, LLC v. Harris Bank, N.A.*, (*In re Gander Partners, LLC*), 432 B.R. 781, 788 (Bankr. N.D. Ill. 2010 ), *aff'd*, 442 B.R. 883 (N.D. Ill. 2011) (noting that an injunction restraining creditors from proceeding against nondebtors is justified only if creditor actions in that regard would frustrate the Debtor's reorganization efforts by distracting the guarantors from reorganizing the debtor).

In *In re Gander Partners*, this Court observed that "[a] section 105 injunction restraining creditors from proceeding against nondebtors is justified only if the creditor actions would interfere with, deplete or adversely affect property of a debtor's estate or which would frustrate the statutory scheme embodied in Chapter 11 or diminish a debtor's ability to formulate a plan of reorganization." 432 B.R. at 788. Courts recognize that the entry of an injunction may be appropriate under the following circumstances:

> 1. there be the danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize[4];
>
> 2. there must be a reasonable likelihood of a successful reorganization;
>
> 3. the court must balance the relative harm as between the debtor and the creditor who would be restrained.
>
> 4. the court must consider the public interest; this requires a balancing of the public interest in successful bankruptcy reorganizations with other competing societal interests.

*Id.* at 788 (citing *In re Monroe Well Service, Inc.*, 67 B.R. 746, 751-52 (Bankr. E.D. Pa. 1986)).

Here, although not required, the Court determines that there has been no showing of danger of imminent, irreparable harm to the Debtor's ability to reorganize. There is no reasonable likelihood of a successful reorganization, as the Debtor's financial projections are unreasonable. Balancing the harm as between the Bank and the Debtor, the Court finds that restraining the Bank is not justified because the Guarantors' time, money and energy are not directed toward the Debtor's reorganization. The public interest would not be served by issuing the Guarantors Injunction as the reorganization proposed herein is not likely to be successful.

### G.      Classification of Claims Pursuant to Bankruptcy Code Section 1122(a)

Next, the Bank argues that the Plan should not be confirmed because the Debtor's

---

[4]The Seventh Circuit does not require a showing of irreparable injury. *See Fisher v. Apostolou*, 155 F.3d 876, 882 (7th Cir. 1998).

classification of claims violates Section 1122(a) of the Bankruptcy Code.

Section 1122(a), which governs classification of claims or interests, provides: "Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). That section does not mandate that a plan proponent classify similar claims together. It provides that dissimilar claims cannot be placed into the same class. *In re Loop 76, LLC,* 465 B.R. 525, 536 (B.A.P. 9th Cir. 2012). Although debtors are prohibited from separately classifying claims to "gerrymander an affirmative vote on reorganization," claims may be classified separately if "significant disparities exist between the legal rights of the holders . . . which render the two claims not substantially similar." *In re Wabash Valley Power Ass'n., Inc.,* 72 F.3d 1305, 1321 (7th Cir. 1995) (internal citations omitted); 11 U.S.C. § 1122(a).

Section 1122(b) provides that a "plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." 11 U.S.C. § 1122(b). "The proponent of the plan must demonstrate a justification for its classification scheme and that the classification is not motivated by the purpose of gerrymandering an affirmative vote of an impaired class." *See In re Porcelli,* 319 B.R. 8, 10 (Bankr. M.D. Fla. 2004) citing *In re Holley Garden Apartments, Ltd.,* 223 B.R. 822, 824-25 (Bankr. M.D. Fla. 1998).

Here, the Bank argues that the Debtor impermissibly separately classified the Class 5 claims under $1,500, from the Class 7 unsecured general unsecured claims. The Debtor responds that separate classification is appropriate because Class 5 unsecured creditors will receive lump sum payments that are approximately equal to the distributions they would have received if they were included with the Class 7 general unsecured creditors. Otherwise, the Debtor argues, the Class 5 creditors would receive minuscule monthly distributions that would be administratively burdensome for the Reorganized Debtor. The Court need not decide whether the Debtor's proffered justification is sufficient, however, as there is no risk of inappropriate gerrymandering

-34-

since each of the unsecured creditors in Classes 5 and 7 have voted to accept the Debtor's Plan. (*See* Debtor's Exhibit E, Ballot Report, dkt. nos. 511, 517, 518, 521.) Accordingly, the Bank's objection in this regard is overruled.

### H.   Good Faith of the Plan

The Bankruptcy Code requires that a debtor's plan be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3). Bankruptcy judges have broad discretion in determinating whether a debtor's plan has been filed in good faith. *In re American Consol. Transp. Cos., Inc.*, 470 B.R. at 493. Good faith is "generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *203 N. LaSalle St. Partnership, 126 F.3d at 969, rev'd on other grounds* (internal citation omitted). Further, the plan must have "a true purpose and fact-based hope of either 'preserving going concern' or 'maximizing property available to satisfy creditors.'" *In re American Consol. Transp. Cos., Inc.*, 470 B.R. at 493 (internal citation omitted).

The Bank argues that the Plan is not proposed in good faith and asserts that its main purpose is to protect the nondebtor Guarantors.

Schwartz testified that the main purpose of the Plan is to pay off the Bank's claim in full. (*See* Tr. Vol. V, 923.) The evidence presented in these proceedings suggests otherwise. Rather than offer the new investment opportunity to third-party investors, which might have procured additional funds for the Debtor's cash reserve, Schwartz elected to condition his new equity contribution upon the entry of a non-consensual Guarantors Injunction. In doing so, Schwartz effectively foreclosed the opportunity for third-party investors to provide a larger new equity contribution which could have been used to satisfy the Bank's claim. In light of these circumstances, the Court concludes that the Plan was not proposed in good faith.

## V.    The Bank's Motion for Relief from the Stay

On August 27, 2012, the Bank filed a motion seeking relief from the automatic stay, pursuant to section 362(d) of the Bankruptcy Code. (*See* dkt. no. 552.)

That section provides in pertinent part as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay–
>
>> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>> (2) with respect to a stay of an act against property under subsection (a) of this section, if –
>>> (A) the debtor does not have an equity in such property; and
>>> (B) such property is not necessary to an effective reorganization . . .

11 U.S.C. § 362(d)(1) and (2).

Generally, a secured creditor is entitled to relief from the automatic stay under section 362(d)(1) for "cause." Under section 362(d)(2), a secured creditor is entitled to stay relief if the debtor lacks equity in the property, and the property is not necessary for an effective reorganization. "To be 'effective,' a plan must be confirmable." *Edgewater Walk Apartments v. MONY Life Ins. Co. of Am.*, 162 B.R. 490, 498 (N.D. Ill. 1993). Thus, the confirmation requirements of 11 U.S.C. § 1129 must be met. *Id.*

The Bank, as the moving party, bears the burden of proof on the issue of the Debtor's equity in the Property. The Debtor bears the burden of proof on all other issues, such as whether the property is necessary to an effective reorganization. *See* 11 U.S.C. § 362(g).

The Debtor must show that there "is a reasonable possibility of a successful reorganization within a reasonable time." *In re Caldwell Corners Partnership*, 174 B.R. 744, 759 (Bankr. N.D. Ill. 1994) (citing *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375 (1988)); *Edgewater*, 162 B.R. at 495. "This is known as the feasibility

-36-

standard." *In re 8th Street Village L.P.*, 94 B.R. 993, 995 (N.D. Ill. 1988).

The Bank's Relief from Stay Motion is premised in part on the Debtor's inability to propose a confirmable plan of reorganization.  As discussed in the Bank's objection to Plan confirmation, it asserts that the Debtor's Plan fails to met the requirements of Section 1129(a)(1) requiring compliance with applicable Code provisions: Section1129(a)(7) by not providing sufficient value to the Bank in the seventh year of the Plan; Section 1129(a)(8) which requires that each class accept the plan or not be impaired under the plan and Section 1129(a)(11) which requires that the plan proponent establish that the Plan is not likely to be followed by liquidation, the need for further financial reorganization of the debtor or any successor to the debtor.

As discussed above, the Court finds that the Debtor has not established by a preponderance of the evidence that its Plan is feasible.  *In re Repurchase Corp*, 332 B.R. at 342. The Debtor presented no credible evidence to support its contention that the Debtor will be able to finance the nearly $8.2 million balloon payment to the Bank at the end of the 7-year plan.  The Court accords little weight to Detling's testimony that in year 2019 the Property will be worth $9,600,000 (1) as his opinion is highly speculative in light of his testimony concerning the Appraisal Institutes' recommendations when determining a future value date, (2) the credible testimony of the Bank's rebuttal expert and (3) the Debtor's historic performance.

The Plan relies on highly speculative revenue projections, the achievement of which are not supported by the evidence.  The Court also finds that the Debtor's cash flow projections, which govern the rental payments under the Master Lease, are overly aggressive and highly speculative.  According to the Bank's feasibility expert, if the Property fails to meet its forecasted cash flow by 10%, it will lead to a substantial deficiency throughout the Plan term. (*See* Wells Fargo Exhibit 7, p. 4, Report of MCA Financial Group, Ltd.); *In re Made in Detroit, Inc.*, 299 B.R. 170, 179-80 (Bankr. E.D. Mich. 2003) (denying confirmation of a plan proposed by a debtor where the debtor failed to show the ability to obtain financing; and confirming a competing plan). The evidence also establishes that at the conclusion of the confirmation hearing, the Debtor's

-37-

sole tenant under the Master Lease Agreement, SE El Monte, had yet to be capitalized.

The Court also finds that the Debtor has failed to prove the reasonable possibility of a successful reorganization within a reasonable period of time. The Debtor's Bankruptcy Case has been pending for over a year and the Debtor has been unable to propose a confirmable plan of reorganization. Notwithstanding the length of time since the Petition Date, the Debtor has yet to obtain a letter of credit or make the cash deposit required by the Master Lease.

Finally, the Court finds that the Debtor has failed to establish that there is equity in the Property. The parties do not dispute the $8.1 million value of the Property, or the Bank's $12.4 million claim amount. (*See* Tr. Vol. I, 9-10; Stipulation, dkt. no. 423, p. 2, ¶ C.) At that value level, and a claim amount of $12.4 million, the Court determines that there is no equity in the Property.

The Court finds that pursuant to Section 362(d)(2)(A) and (B), the Debtor does not have equity in the Property and that such Property is not necessary to an effective and timely reorganization.

The Court will enter separate orders denying confirmation and lifting the automatic stay.

Dated: February 27, 2013                    ENTER:

*Jacqueline P. Cox*

J. P. Cox

_____
Jacqueline P. Cox
U.S. Bankruptcy Judge

-38-