UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Bankruptcy No. 11-40944 |
| GAC STORAGE EL MONTE, LLC, et al., | ) | |
| (Jointly Administered under Caption | ) | |
| GAC Storage Lansing, LLC, et al.) | ) | (Jointly Administered) |
| | ) | |
| Debtor. | ) | Hon. Jacqueline P. Cox |
| | ) | |

Amended Memorandum Opinion Denying Confirmation of GAC El Monte, LLC's Third
Amended Plan of Reorganization & Granting Relief from the Stay (dkt. nos. 552, 613)

## I.      Jurisdiction and Venue

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  These are core proceedings
pursuant to 28 U.S.C. §§ 157(b)(2)(G) and (L). The Court has jurisdiction to determine these
matters pursuant to 28 U.S.C. § 1334.

## II.     Facts and Background

These matters are before the Court for determination of Wells Fargo Bank, N.A.'s
Motion to Lift Stay and Confirmation of the Third Amended Chapter 11 Plan of GAC Storage El
Monte, LLC ("El Monte" or the "Debtor"), Bankruptcy Case No. 11-42638. (*See* dkt. no. 613.)
The Debtor's case is being jointly administered with the Chapter 11 cases of GAC Storage
Lansing, LLC (Case No. 11-40944), GAC Storage Copley Place, LLC (Case No. 11-40953),
GAC Storage Anza, LLC (Case No. 11-48549), and San Tan Plaza, LLC (Case No. 11-48939)
for administrative purposes under Lead Bankruptcy Case GAC Storage Lansing, LLC,
No. 11-40944.  This opinion is captioned as GAC Storage El Monte, LLC to distinguish it from
the opinion entered herein on January 10, 2013 as to debtor GAC Storage Copley Place, LLC.

The Debtor, formed on or about June 1, 2006, is a California limited liability company
whose principal place of business is located at 11310 Stewart St., El Monte, California (the
"Property").  The Debtor is the owner and operator of a self-storage facility comprised of two

buildings containing 126,000 square feet of storage space. (*See* dkt. no. 447.)

In 2006, the Debtor obtained a construction loan in the amount of $11,900,000 from Lehman Brothers to finance construction of the Property. (*See* Debtor's Exhibit B, Section II, p. 2.) In February, 2008, the Debtor entered into a Loan Agreement with Wachovia Bank, N.A. ("Wachovia"), predecessor in interest to Wells Fargo Bank, N.A. ("the Bank"), in the amount of $12,650,000 (the "Loan") to refinance the original construction loan and to complete the construction and development of the Property. *Id.*

On September 8, 2010, Wachovia issued a Notice of Default and Election to Sell due to the Debtor's failure to pay the remaining balance of $12,041,222.25 by the Loan's maturity date. *Id.* Shortly thereafter, the Supreme Court of the State of California, County of Los Angeles appointed Trigild Inc. as the receiver for the Property ("Receiver").

On October 20, 2011, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code (the "Petition Date"). Since the Petition Date, the Debtor has remained in possession of the Property, and has continued to operate its business as a debtor in possession pursuant to Bankruptcy Code (the "Code") Sections 323, 1107, and 1108. Section 323 provides that the trustee is the representative of the bankruptcy estate and that he or she can sue and be sued. 11 U.S.C. §§ 323(a) and (b). Pursuant to Section 1107, the Debtor has all of the rights and powers of a trustee in bankruptcy. 11 U.S.C. § 1107(a). Section 1108 provides that the trustee may operate the debtor's business. 11 U.S.C. § 1108.

On June 28, 2012, the Bank filed its Proof of Claim in the amount of $12,436,929.19, which claim amount has been stipulated to by the parties. (*See* Bankruptcy Case No. 11-40944, Claim no. 3-3; dkt. no. 423, p. 2, ¶ C.)

## III.   The Debtor's Third Amended Plan

On September 27, 2012, the Debtor filed its Third Amended Chapter 11 Plan of Reorganization (the "Plan"). (*See* Debtor's Exhibit A, dkt. no. 613.)

### A.   The Bank's Claim

Class 2 of the Plan consists of the Bank Secured Claim in the amount of $8,000,000. The Plan further provides that:

    (i)      In the absence of the Bank making the Section 1111(b) Election, in full satisfaction of the Allowed Bank Secured Claim, the Allowed Bank Secured Claim shall be reduced by the total amount of the adequate protection payments made by the Debtor to the Bank since the commencement of the Case (the **"Adequate Protection Payment Reduction"**), and the Reorganized Debtor shall pay to the Holder of the balance of the Allowed Bank Secured Claim (less the Adequate Protection Payment Reduction): (i) from and after the Effective Date for the first twelve months thereafter, monthly interest payments (**"Monthly Interest Payments"**) on the unpaid balance of the Allowed Bank Secured Claim calculated at 4.9% per annum, which Monthly Payments shall commence to accrue on the Effective Date, become payable on the fifth (5th) day of the first full month after the Effective Date (the **"First Payment Date"**), and continue to be paid on the same day of each month thereafter until the earlier of the date the Allowed Bank Secured Claim is paid in full or the First Anniversary Date; (ii) monthly principal and interest payments ("Monthly Payments") on the unpaid balance of the Allowed Bank Secured Claim, based on a thirty (30) year amortization, with interest calculated at 4.9% per annum, which Monthly Payments shall commence to accrue on the First Anniversary Date, become payable on the fifth (5th) day of the first full month after the First Anniversary Date, and continue to be paid on the same day of each month thereafter until the earlier of the date the Allowed Bank Secured Claim is paid in full or the Maturity Date; and (iii) a balloon payment of

-3-

the unpaid balance of the Allowed Bank Secured Claim plus any accrued and unpaid interest, which balloon payment shall occur and shall be due and payable on the Maturity Date.

(ii)    In the event of the Bank making the Section 1111(b) Election, in addition to the treatment provided in subsection (i) immediately above, the Bank shall also receive (a) fixed monthly payments of $6,666 (the "**1111(b) Payments**"), which payments shall commence on the First Payment Date, and continue to be paid on the same day of each month thereafter until the Maturity Date, and (b) a balloon payment of the unpaid balance of the Allowed Bank Claim, less the Adequate Protection Payment Reduction and less all payments made to the Bank under any provision of this Plan, which balloon payment shall occur and shall be due and payable on the Maturity Date.

*See* dkt. no. 613, ¶ 2.2.2.

**B.    The Master Lease Agreement**

The Plan also contemplates a 7-year Master Lease Agreement (the "Master Lease") which was executed on November 12, 2012.  (*See* Debtor's Exhibit G, Master Lease Agreement.) Pursuant to the Master Lease, GAC Storage El Monte, LLC, as landlord, will lease its real estate and storage facility business to the tenant, SE El Monte Leasehold, LLC ("SE El Monte"), which will operate the storage facility.  SE El Monte, an affiliate of Storage, Etc., is a special purpose entity formed to be a party to the Master Lease.  The Master Lease requires that SE El Monte provide a $1 million letter of credit or a cash deposit in the amount of $1 million as security.  *Id.*

The Master Lease provides that SE El Monte will pay the Debtor monthly rental payments equal to the amount of net operating income set forth in the Debtor's 7-year cash flow projections.  In the first year, rent starts at $46,825 per month and increases annually to coincide with the anticipated increase of the Debtor's net operating income through the end of the 7-year

-4-

Plan term. (*See* Debtor's Exhibit G, Schedule 1(i) Minimum Monthly Rental, p. 22.)  Rent from

the storage facility's tenants would effectively flow through the SE El Monte entity to the Debtor

to fund the Debtor's payments to the Bank.  In the event that the storage facility does not meet

the cash flow projections, SE El Monte would draw from its operating reserve, which would be

funded at that entity's capitalization.

### C.    The Guarantors Injunction

The guarantors of the Loan Documents are: Noam Schwartz, Rachel Elmalam, the Noam

Schwartz Living Trust, Yoel Iny, Tikva Iny, and the Y & T Iny Family Trust (the "Guarantors").

(*See* Debtor's Exhibit A, Article 1.1.42, p. 5; dkt. no. 613.)  The Plan calls for a $146,000 new

equity contribution by Ronnie Schwartz, the sole member of Newco, the Reorganized Debtor,

and a contribution by the Guarantors of the original Loan in the amount of $100,000.  In

consideration of the contribution of the above funds the Confirmation Order will operate as an

injunction against the commencement or continuation of claims against the Guarantors under the

Bank Loan Documents.  (*See* Disclosure Statement, Section 8.4, Exhibit B, p. 23, dkt. no. 487;

Hearing Tr. Vol. V, 1004-05, Dec. 6, 2012).

### D.    The Debtor's Balloting Report

The Debtor's Report of Balloting reflects that, with respect to the Class 2 Bank Claim in

the amount of $12,436,929.19, one vote rejected the Debtor's Plan. Three ballots were received

in connection with Class 5 claims, in the amount of $754.11, accepting the Debtor's Plan.  One

ballot was received in connection with Class 7 claims, in the amount of $8,102, accepting the

Debtor's Plan.  (*See* Debtor's Exhibit E, Report of Balloting, dkt. no. 541.)

The Bank elected to treat its claim as fully secured pursuant to 11 U.S.C. § 1111(b).  (*See*

Statement of Section 1111(b) Election, dkt. no 414.)  *See In re Woodbrook Assocs.*, 19 F.3d 312,

317, n.2 (7th Cir. 1994) ("[a]n unsecured creditor has a secured claim up to the value of the

collateral and an unsecured claim for the deficiency. 11 U.S.C. §§ 506(a), 1111(b). An undersecured creditor, however, may waive its deficiency claim and elect, under § 1111(b)(2) to have its claim treated as secured for the entire amount of the debt.").

## IV.    Discussion

### A.    Plan Confirmation

Code Section 1129 sets forth the requirements for confirmation of a Chapter 11 Plan. *See In re 203 N. LaSalle St. P'ship*, 126 F.3d 955, 960 (7th Cir. 1997), *rev'd on other grounds*, 526 U.S. 434 (1999). That section provides in pertinent part:

> (a) The court shall confirm a plan only if all of the following requirements are met:
>
> (1) The plan complies with the applicable provisions of this title.
>
> (2) The proponent of the plan complies with the applicable provisions of this title.
>
> (3) The plan has been proposed in good faith and not by any means forbidden by law.
> ***
> (8) With respect to each class of claims or interests-
>
> (A) such class has accepted the plan; or
>
> (B) such class is not impaired under the plan.
> ***
>
> (11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.
>
> (b)(1)    Notwithstanding section 510(a) of this title, if all of the applicable requirements

-6-

of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

    (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

        (A) With respect to a class of secured claims, the plan provides–

            (i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

            (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

11 U.S.C. § 1129.

The plan proponent bears the burden of proving by a preponderance of the evidence that each of the requirements of Section 1129(a) are met. *In re Mayslake Village-Plainfield Campus, Inc*, 441 B.R. 309, 316 (Bankr. N.D. Ill. 2010); *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005).

## B. Feasibility of the Debtor's Third Amended Plan

The Section 1129(a)(11) feasibility standard requiring that confirmation of the plan is not likely to be followed by the liquidation, or further financial reorganization of a debtor imposes on "a bankruptcy judge . . . an affirmative obligation to ensure that a plan of reorganization is

feasible." *In re Repurchase Corp.*, 332 B.R. at 343.

"The feasibility requirement mandates that the plan proponent offer concrete evidence of sufficient cash flow to fund and maintain both its operations and its obligations under the plan." *In re American Consol. Transp. Cos., Inc.*, 470 B.R. 478, 489 (Bankr. N.D. Ill. 2012) (citing *Coones v. Mut. Life Ins. Co. of N.Y.*, 168 B.R. 247, 255 (D.Wyo. 1994), *aff'd*, 56 F.3d 77 (10th Cir. 1995)).  In determining feasibility, a plan proponent is not required to show that the plan is guaranteed to succeed. *In re 203 N. LaSalle St. P'ship*, 126 F.3d at 961-62. Rather, a reasonable assurance of commercial viability is required. *Id.*  In making this determination, the court may examine: (i) the adequacy of the capital structure; (ii) the earning power of the business; (iii) economic conditions; (iv) the ability of the management; (v) the probability of the continuation of the same management and (vi) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re U.S. Truck Co., Inc.* 800 F.2d 581, 589 (6th Cir. 1986).

### 1.   Value of the Debtor's Property at the End of the Plan

The Bank argues that the Plan fails to meet the feasibility standard of Section 1129(a)(11) of the Code because the Debtor cannot demonstrate its ability to execute on a refinance or full payment sale by the maturity date.  The Court agrees and finds that the Debtor has not established by a preponderance of the evidence that it will be able to obtain financing to fund the final balloon payment, making it likely that confirmation of its Plan will be followed by a liquidation or further financial reorganization.

The Debtor and the Bank stipulated to the value of the Debtor's Property as $8.1 million. (*See* Hearing Tr. Vol. I, 9-10, Nov. 13, 2012.)  The undisputed amount of the Bank's claim, as of the Petition Date, was  $12.4 million. (*See* Stipulation, dkt. no. 423, p. 2, ¶ C.)

Thus, the key issue concerns the reliability of the prospective value figure which the

Debtor proffers to be $9.6 million in year 2019 and whether the Debtor has the ability to pay off the Bank's claim when the balloon payment comes due through a refinancing or a sale. After due consideration of the evidence presented at trial, the Court determines that the Debtor has failed to prove that it will have the requisite means to pay off the Bank at the conclusion of its Plan.

The Debtor called Mr. Robin Detling ("Detling"), a commercial real estate appraiser for Colliers International to testify as its expert on valuation. Detling attended Brigham Young University where he received a Bachelor's degree in Management. In 2003, Detling joined Colliers International Valuation and Advisory Services where he serves as the managing director of its San Diego office. (*See* Debtor's Exhibit S.) Detling conducts appraisals for commercial income-producing real estate, including self-storage facilities. In 2010, he obtained an MAI (Member Appraisal Institute) Appraisal designation from the Appraisal Institute, which is their commercial real estate appraisal designation.

The MAI designation entails several hundred hours of professional education as well as submission of a sample demonstration appraisal report which gets reviewed by peers in the appraisal industry. One third of his work consists of appraising self-storage and mixed used developments. As a licensed appraiser, Detling is required to follow the Uniform Standards of Professional Appraisal Practice ("USPAP"), which he testified he followed in connection with preparing the appraisal of the Property herein. Detling's valuation opinion for the Debtor's Property consists of a determination of the Property's as-is value, a 7-year prospective market value for the year 2019, the Hypothetical Market Value scenario, and a liquidation analysis. (*See* Debtor's Exhibit R, Letter of Transmittal.) Detling testified that prior to his work on this case he had not provided a prospective value opinion of five or more years for an existing storage facility. (*See* Hearing Tr. Vol. II, 361, Nov. 14, 2012.)

Detling testified that he considered information on the Debtor's historical property performance, the building size, the percentage of income-producing units and rent rolls listing the tenants and the rent amounts paid. In addition, Detling conducted a physical inspection of the

Property.

Detling's report notes that the analyses, opinions and conclusions communicated within were developed based upon the requirements and guidelines of the current USPAP. An "Extraordinary Assumption" is defined by USPAP as "an assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraisers' opinions or conclusions." (*See* Debtor's Exhibit R, Letter of Transmittal.) No extraordinary assumption was made regarding the economy remaining stable throughout the 7-year Plan term. (*See* Tr. Vol. II, 383.)

Detling employed the income and sales comparison approaches to valuation for the appraisal and determined the Hypothetical Market Value to be $8.6 million, the as-is market value of the property to be $8.03 million and the 7-year prospective value to be $9.6 million. (*See* Debtor's Exhibit R, Letter of Transmittal.) Under the Income Approach, Detling utilized the direct capitalization method, in which he analyzed the relationship of one year's stabilized net operating income to total property value. (*See* Debtor's Exhibit R, pp. 44-45.) By definition, direct capitalization captures anticipated future benefits by capitalizing one year of net income at a rate that reflects all of an investor's expectations about the future performance of a property. (*See* Tr. Vol. II, 382.) It entails converting an estimate of stabilized net operating income into an indication of value by dividing it by an overall capitalization rate. As explained in Detling's report:

> the first step in the Direct Capitalization method is to estimate the subject's potential gross income. This process is accomplished through a comparison of the subject with similar properties having similar locations and utility. Vacancy allowance and operating expenses are deducted, based on market analysis. Finally, the resulting net operating income is capitalized at an appropriate supported rate.

*See* Debtor's Exhibit R, p. 45.

-10-

At the time of Detling's report, the physical occupancy of the Property was 62.5%. (*See* Debtor's Exhibit R, p. 53.) The $8.6 million Hypothetical Market Value figure at stabilization assumes that the Property will operate at a stabilized occupancy rate of 83%. (*See* Debtor's Exhibit R, p. 68.) This figure also assumes that the units will be rented at market rates. (*See* Tr. Vol. II, 364-65.)

To achieve the as-is value opinion, Detling conducted a lease-up analysis over 24 months and deducted the costs that would be incurred to lease the Property from its current occupancy rate of 62.5% (Tr. Vol II, 237-38) to a stabilized occupancy rate of 83%. (*See* Debtor's Exhibit R, p. 67.) Detling applied deductions to account for rental concessions the Property may offer to promote occupancy and move-ins. After deducting the absorption costs, Detling arrived at the as-is market value opinion of $8.03 million. (*See* Debtor's Exhibit R, p. 68.)

To determine the 7-year prospective market value as of August 1, 2019, Detling performed the direct capitalization method of the Property's projected net operating income. According to Detling's report he applied a growth rate of 3% to the rent and other sources of income beginning in year 3, and a 3% growth rate to expenses. (*See* Debtor's Exhibit R, p. 69.) The projected net operating income for the year following August 1, 2019 is $743,128. (*Id.* at 69.) Detling then applied a prospective capitalization rate of 7.75%.

The Debtor's Plan proposes to leave the majority of the Bank's claim unpaid until the end of the 7-year term, at which time it will pay off the $8,173,152 balance in full. (*See* Debtor's Exhibit H, Revised Projections.) Thus, Detling's prospective value opinion of $9.6 million is offered to support the Debtor's position that the Property will have sufficient value at the end of the Plan to support a refinance or sale at a level sufficient to cover the Bank's claim.

After giving due consideration to Detling's testimony and report, the Court finds that the Debtor has not shown that it will have the requisite financing to fund the balloon payment at the end of the Plan's 7-year term. The overall lack of data supporting Detling's conclusions renders

his valuation opinions unreliable and unhelpful to the Court.

The Debtor correctly notes in its response to the Bank's objection that there are no prohibitions on long-term plans. However, the Debtor is required to present credible evidence to the Court demonstrating that the balloon payment will likely be made by the Plan's maturity date. *See In re Mayslake,* 441 B.R at 317. As one court noted, "Whether that balloon payment can likely be made, and new financing acquired, requires credible evidence proving that obtaining that future financing is a reasonable likelihood." *In re Seasons Partners, LLC,* 439 B.R. 505, 515 (Bankr. D. Ariz. 2010); *see also U.S. v. Rader,* 2002 WL 1354714 (S.D. Ind. Apr. 17, 2002) ("Although plans requiring balloon payments are not necessarily unfeasible, courts view such plans with suspicion unless the debtor can show through definite and credible evidence that he will have the financial ability to make the balloon payment.").

The Court found Detling's testimony concerning the methodology used and his adherence to the Appraisal Institute's recommendation when calculating a future value to be inconsistent, and consequently damaging to his credibility. In particular, although Detling acknowledges the Appraisal Institute's recommendation for an "automatic" extraordinary assumption that relates to the potential changes between the current time, and the effective future value date to account for uncertainties in the future, he testified during cross examination that making such an assumption was unnecessary in this case. (*See* Bank's Motion in Limine, dkt. nos. 693, 708, Exhibit A, p. 9; Tr. Vol. II, 393-95.) Detling defended his decision in this regard by noting that his appraisal report applied annual growth rates of 3% to account for changes in income and expenses. (*See* Tr. Vol. II, 393-94.) The Court questions Detling's reluctance to adhere to the Appraisal Institute's guidelines on future value when he testified on direct examination that he relied on the Appraisal Institute's instruction on advanced income capitalization.

The Court found the Bank's rebuttal real estate appraiser, Mr. David Michael Mason ("Mason"), to be persuasive. Mason received a Bachelor's of Science degree in Business Administration from California State University in 1980. *(See* Wells Fargo Exhibit 1, Tr. Vol. II,

-12-

422.) Mason is an MAI and SRA designated member of the Appraisal Institute. (*See* Wells Fargo, Exhibit 1, p. 1; Tr. Vol. II, 422.) About 90-95% of Mason's work consists of commercial appraisals. Throughout his career he estimates that he has appraised 30-35 self-storage facilities. (*See* Tr. Vol. II, 429**.**) Mason taught real estate appraisal and real estate investment analysis courses at the University of Southern California for 12 years, and has taught a course entitled "The Standards of Professional Appraisal Practice" at the Appraisal Institute since 1990. (*See* Tr. Vol. II, 431.) Mason testified credibly that in his 25-year career, he has never made a value conclusion seven years in the future. (*See* Tr. Vol. II, 438-39.) He explained that such an opinion cannot be accurately forecasted and therefore will not be credible or trustworthy. *(See* Tr. Vol II, 446[1].)

The Court determines that the Debtor has failed to prove through its appraisal testimony that the Property will be worth $9.6 million in seven years when the balloon payment becomes due. Accordingly, the Court finds that the feasibility standard of Section 1129(a)(11) has not been met.

2.     **The Plan's Unsupported Projections**

Next, the Bank argues that the Plan is not feasible because it is based on unrealistic cash flow projections. The Debtor in turn argues that the income generated by the Reorganized Debtor under the Master Lease will be more than adequate to fund Plan payments to the Bank with a buildup of cash over the life of the Plan. (*See* Debtor's Response, dkt. no. 618, p. 6.) (*See* Debtor's Exhibit H, Revised Master Lease Projections.)

The Debtor called Mr. Chris Lyons ("Lyons") to testify as a representative of Storage, Etc., a company which owns, manages and develops self-storage properties. (*See* Tr. Vol. I, 16-17.) Lyons has a Bachelor's of Science degree in Accounting from the State University of New

---

[1]Debtor's objection to Mason's testimony regarding prospective value conclusions was taken under advisement by the Court. *See* Tr. Vol. II, 452.

York, at Fedonia and a Master's in Business Administration degree from the University at Buffalo. (*See* Debtor's Exhibit L, p. 3.) Lyons has worked in the self-storage industry for 24 years; he has served as Storage, Etc.'s Vice President for 12 years. *(See* Debtor's Exhibit L, p. 3, Tr. Vol. I, 20, 25.) On January 4, 2012, Storage, Etc. took over management of the Debtor's Property. (*See* Tr. Vol. I, 26-27; Debtor's Exhibit B, Section II, ¶ B, p. 4.) Lyons' testimony focused on his role in preparing the Property's projections and the Plan's terms regarding the Master Lease.

The Bank called Mr. Morris Aaron ("Aaron"), a Certified Public Accountant, as its plan feasibility and interest rate expert. Aaron received a Master's in Business Administration degree from Columbia University with a concentration in finance and management. Aaron is currently affiliated with the MCA Financial Group, where he provides consulting and valuation services in the bankruptcy context. MCA has served as a trustee in bankruptcy cases and as a court-appointed receiver in cases in federal and state courts. (*See* Hearing Tr. Vol. IV, 704-05, Dec. 5, 2012.) Aaron estimates that he has testified as an expert in bankruptcy cases at least 20 times. (*See* Tr. Vol. IV, 707-08.)

In his report, Aaron opined that the Debtor's Plan is not feasible because it is based on aggressive cash flow projections which are not consistent with the Debtor's current performance. He opined that the Plan fails to appreciate that rental rates may decline and that additional rental rate concessions may have to be offered to encourage existing tenants to renew their tenancies. Further, Aaron observed that just a 10% deviation in the Debtor's revenue forecast will result in negative cash flows of ($1,052,456) and ($88,753) in years 1 and 2, and minimal cash flows in years 3 and 4. (*See* Wells Fargo Exhibit 7, p. 4, Report of MCA Financial Group, Ltd.) Aaron concludes that the Debtor's Plan anticipates leasing spaces at a rate not in line with current market conditions. The Court agrees.

Beyond the annual rent increases and the addition of internet marketing, the Court heard little evidence to substantiate the significant growth projected in the Debtor's Plan. (*See*

-14-

Debtor's Exhibit P.)  While the Debtor's forecast provides for substantial increases in the Property's occupancy level, the Plan lacks detail as to how the Debtor plans to achieve those results.  The Debtor's projections require a monthly average growth rate of 1.76% during the first eight months of the Plan term; the Debtor's historic performance does not reflect such growth.  (*See* Debtor's Exhibit P.)

The Court notes that although some of the Bank's concerns and the issues raised in Aaron's report have been addressed by the Debtor, such as the replacement of a non-binding letter of intent with the Master Lease, many feasibility issues remain unresolved.  The evidence presented at trial reveals that SE El Monte, the Debtor's tenant and sole source of income through the pendency of the Plan, had yet to be capitalized at the time of the confirmation hearing.  (*See* Tr. Vol. I, 86.)  Further, Storage, Etc. had not obtained the letter of credit or the $1 million dollar security deposit due under the Master Lease.  (*See* Tr. Vol. I, 86-87.)  At trial, Lyons was unable to provide the name of a financial institution willing to provide a letter of credit, although he was optimistic that one would be obtained.  (*See* Tr. Vol. I., 87-88.)  In the event that the storage facility is unable to achieve the net operating income projections which dictate SE El Monte's rental payments to the Debtor, there is no evidence that SE El Monte has sufficient capital reserves to fulfill its contractual obligations to the Debtor, which could leave the Debtor without funds to make its payments to the Bank.  When questioned on cross examination regarding the likelihood that Storage, Etc. would obtain these securities, Mr. Lyons said that he was confident that the additional capital would be obtained because he knew of potential investors.[2]  (*See* Tr. Vol. I, 87-89.)  Unfortunately for the Debtor, such assurances, absent concrete evidence, are insufficient to establish that the terms set forth in its Plan are feasible.  *See Chase Manhattan Mortgage & Realty Trust v. Bergman (In re Bergman),* 585 F.2d 1171, 1179 (2d Cir. 1978) ("Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises.").  Here, the scarcity of such vital information is fatal to the Debtor's Plan, as the rental income under the Master Lease is the sole

_____

[2]Has the Debtor failed to disclose the identities of such potential investors in violation of 11 U.S.C. §§ 1125 and 1127?  *See* Section IV, D herein.

source of funding for the Debtor's Plan.

### C.   Cram Down Requirements of Section 1129(b)

The Bank also objects to confirmation of the Plan because the Debtor's proffered interest rate of 4.88% (rounded up to 4.9% in the Plan) does not adequately reflect the risk of non-payment and submits that an appropriate rate of interest for the Bank's claim is at least 8.6%. It contends that the Plan's treatment of the Bank's claim violates the fair and equitable test noted herein at Section IV. A, and for that reason, confirmation of the Plan should be denied.

If each class of claims and interests has not accepted the plan or is impaired, to be confirmed over a creditor's objection, the plan can not discriminate unfairly between impaired classes and must be fair and equitable to the classes of creditors that have rejected the plan. 11 U.S.C. § 1129(b)(1). *In re Mayslake*, 441 B.R. at 316. This is commonly referred to as the Code's "cram down" provision.

Where the plan provides for the retention of the secured creditor's collateral, the condition that the plan be fair and equitable with respect to a class includes the following: i) that the plan provides that the creditor retains its lien on the collateral and ii) that the creditor receives deferred cash payments equal to the present value of the allowed claim. 11 U.S.C §1129(b)(2)(A). The plan of reorganization cannot unfairly shift the risk of a plan's failure to the creditor. *In re Monarch Beach Venture, Ltd.*, 166 B.R. 428, 436 (C.D. Cal. 1993).

The Debtor's Plan must propose an interest rate adequate to assure the realization of the Bank's claim, which for purposes of confirmation, is $12.4 million. *See In re Bloomingdale Partners, LLP*, 155 B.R. 961, 977 (Bankr. N.D. Ill. 1993).

While the Debtor bears the burden of proof on plan confirmation issues, the Bank bears the burden of establishing that an additional risk adjustment is necessary. *See In re American*

*Consol. Transp. Cos., Inc.* 470 B.R. at 487; *Till v. SCS Credit Corp.*, 541 U.S. 465, 484-85 (2004) ("Thus, the approach, which begins with a concededly low estimate of the appropriate interest rate and requires the creditor to present evidence supporting a higher rate, places the evidentiary burden on the more knowledgeable party, thereby facilitating more accurate calculation of the appropriate interest rate.")[3].

### 1.    Determination of an Appropriate Rate of Interest

The Court finds that the interest rate proposed by the Debtor fails to capture the risk of nonpayment inherent in its Plan and concludes that 8.6% is an appropriate rate of interest given the Debtor's circumstances.

The Debtor called Mr. Kenneth Funsten ("Funsten") to testify as its plan feasibility and interest rate expert. Funsten received a Master's in Business Administration degree in finance and real estate from the University of Southern California and has over 20 years experience as a debt analyst, trader and portfolio manager. (*See* Debtor's Exhibit T, p. 31.) To prepare his report, Funsten reviewed the Debtor's Plan, Disclosure Statement, cash collateral budget, rent rolls, and conducted a site visit of the Property. He also relied on the figures and assumptions set forth in the Master Lease and the report of the Debtor's appraiser, Detling. (*See* Debtor's Exhibit T, p. 14; Hearing Tr. Vol. III, 576-77, Dec. 4, 2012.)

Funsten opined that no market exists for the Loan, as the Debtor's Property is over-leveraged with a loan-to-value ratio of 97% which is above the level at which commercial banks make loans. (*See* Debtor's Exhibit T, pp. 14, 16.) Therefore, Funsten followed the blended rate approach, which he describes as a *"Till*-guided" formulaic method, and concluded that 4.88% is the appropriate interest rate for this loan, as it will provide the Bank cash payments equal to the

---

[3]Compare with *In re DeTienne Assocs. L.P.,* 2005 Bankr. LEXIS 3122, *18-19 (Bankr. D. Mont. 2005)*, where a bankruptcy judge opined that the burden of satisfying the cramdown requirements under Section 1129(b) remain with the debtor despite the Supreme Court's decision in *Till v. SCS Credit Corp.*

present value of its claim as required by Section 1129(b)(2)(A).  (*See* Debtor's Exhibit U.)

Funsten explained that the blended rate approach entails dividing a single loan into a series of risks, or tranches, and using weighted factors to evaluate each risk's appropriate interest rate before "blending" those rates into a single interest rate.  (*See* Debtor's Exhibit T, p. 20.)  The Blended Rate Approach fixes how much of a plan's proposed new loan deserves an interest rate of prime (the "A" tranche, or the conforming loan piece) and how much of the new loan deserves an interest rate substantially higher than prime (the "B" tranche).  This approach assigns degrees of risk their own interest rate, their own risk-rates, and then weighs and reblends the results to determine a single number.  (*See* Debtor's Exhibit T, p. 21.)  Funsten first assigned the prime rate of 3.25% to the A tranche.  To the B tranche, he assigned a blended interest rate of 8.18%.  (*See* Debtor's Exhibit U, p.1.)  The blended rate totals 4.88% which Funsten asserts is the appropriate rate of interest.

Funsten's report provides a narrative of the collateral, the capacity, plan circumstances and property characteristics (commonly referred to as the four C's of Credit) that were considered in formulating his interest rate conclusion.  (*See* Debtor's Exhibit T, Section F, pp. 14-15.)  This analysis is intended to capture certain risks, or positive factors that may exist for a particular loan.  (*See* Tr. Vol. III, 608-09.)  Funsten noted in his report that the marketing efforts by the Debtor, and its manager, Storage, Etc., have resulted in improved financial results which are expected to continue to improve. (*See* Debtor's Exhibit T, Section E, p. 13.)

In the collateral portion of his analysis, Funsten describes the Debtor's loan-to-value ratio of 97% as "not great," but opines that the Debtor is moving in a positive direction and weighs the collateral factor as neutral.  (*See* Debtor's Exhibit T, Section F, p. 14.)

As to the Debtor's ability to pay pursuant to the Plan terms, Funsten opines that given the Debtor's cash on hand and the anticipated contributions for the payment reserve, the Reorganized Debtor will be able to service its debt obligations.  (*See* Debtor's Exhibit T, Section B, p. 6 &

-18-

Section F, p. 14.)

In his discussion of property characteristics, Funsten stated that the diversity of the Debtor's cash flow, with over 1000 tenants, was one of the positive aspects of the Debtor's Plan. (*See* Debtor's Exhibit T, p. 15.) He explained that this characteristic has a "more certain prospect of creditor repayment than other smaller, less diversified properties." *Id.* As noted above, however, the Debtor has since amended its Plan to provide for one master tenant, SE El Monte.

Funsten defended his interest rate opinion by explaining that because appraisals by nature reflect the risk that the borrower may not be able to perform, care must be taken not to "double-count," thereby artificially increasing the Debtor's risk and the Property's risk. *(See* Debtor's Exhibit T, p. 17.)

The Bank countered that an interest rate in excess of 4.88% per annum was necessary to provide it with the present value of its secured claim and argued that 8.6% is the appropriate rate of interest. (*See* Wells Fargo, Exhibit 7, pp. 3, 8.)

Aaron, the Bank's expert, assumes that the Debtor's valuation of the Property is correct, and that the loan-to-value ratio is in excess of 100%. (*See* Wells Fargo Exhibit 7, p. 6.) According to his report, the formula approach for determining an appropriate interest rate consists of a base rate, plus additional factors to compensate for risks associated with a specific borrower or terms of repayment. He explains that his risk analysis is dependent upon factors such as i) default risk; ii) security risk and iii) interest rate risk. (*See* Wells Fargo, Exhibit 7, p. 6.)

Under the formula approach Aaron began, as did the Debtor's expert, with the prime rate of 3.25%. (*See* Wells Fargo, Exhibit 7, p. 6.) However, Aaron assigns an additional security and default risk adjustment of 2.50% to account for the additional default risk that the Debtor will be

unable to make the payments under the Plan. (*See* Wells Fargo, Exhibit 7, p. 7.) Aaron makes this risk adjustment because in his view, the Property's location presents an additional risk of depressed rental rates and occupancy rates both now and in the future. (*Id.* at 7.) Aaron next assigns a 1% risk adjustment as the interest rate risk for the 7-year term of the Debtor's Plan. The interest rate risk is the risk a lender takes by providing fixed financing while its cost of capital is variable and compensates the lender for the future risk that interest rates will increase over time. (*See* Tr. Vol. IV, 728.) He explains that the interest rate risk adjustment is necessary because the Debtor's Plan exceeds the conventional 3-year term. (*See* Wells Fargo, Exhibit 7, pp. 3, 7.)

Aaron next applied a 2% adjustment to account for security and default risks for a loan above a 65% to 90% loan-to-value ratio. Aaron assumes a loan-to-value ratio of 100%, which indicates significant additional security risk to the Bank as there is no equity cushion. *(See* Wells Fargo, Exhibit 7, pp. 6-7.) Aaron explains that 2% is an appropriate risk adjustment because this is the riskiest piece of the Debtor's loan and it compensates the lender for the risk of nonpayment. Thus, 2% is added to 6.75% to arrive at an interest rate of 8.75 %. Aaron then applied a weighted interest calculation to portions of the Loan to arrive at the appropriate interest rate of 8.6% (rounded). (*See* Wells Fargo Exhibit 7, p. 8.) A chart illustrating Aaron's build-up rate approach has been reproduced below:

|  | Rate Build Up |
|---|---|
| Prime Rate | 3.25% |
| Security & Default Risk – | 2.50% |
| Interest Rate – conforming 65% LTV, 3-year term | 5.75% |
| Interest Rate Risk for 7-year term | 1.00% |
| Interest Rate– conforming 65% LTV, 7-year term | 6.75% |
| Security & Default Risk for loan above 65% to 90% LTV | 2.00% |
| Interest Rate for portion above 65% to 90% LTV | 8.75% |

*See* Wells Fargo, Exhibit 7, p. 8.

Aaron next employed the market survey approach; lenders are surveyed to determine the terms they would offer to the best borrowers under conforming loan conditions. (*See* Bank's

Exhibit 7, pp. 8-9.) The market survey approach is a separate tool used to verify the reasonableness of the assumptions in the formula rate approach. (*See* Wells Fargo, Exhibit 7, p. 9.) This approach consists of a survey of lenders to determine if a market for the Debtor's Loan exists and at what rate of interest it would be available. *(See* Wells Fargo, Exhibit 7, p. 6.) Aaron testified that he uses the market survey approach to verify that the assumptions made under the formula approach are accurate. (*See* Tr. Vol. IV, 719-20.)

In evaluating the Debtor's proposed interest rate, Aaron testified that the Debtor's expert failed to account for the risks associated with the Bank's claim. (*See* Tr. Vol. IV, pp. 746-750.) He opined that the interest rate proposed by the Debtor is not appropriate given the Plan's proposed repayment terms, the risks inherent in the Plan, the current occupancy and cash flow levels of the property as well as current market conditions. (*See* Wells Fargo, Exhibit 7, pp. 2-3.)

### 2.    The Bank's Proffered Interest Rate

Although both experts contend they followed the guidelines noted in the Supreme Court's plurality decision in *Till*, the Court finds that the interest rate proffered by the Debtor does not include adequate risk adjustments.

In *Till*, the Supreme Court opined on the correct approach for selecting an appropriate interest rate for cramdown in the Chapter 13 context.[4] There, the plurality concluded that a "prime plus" formula rate approach, which is based upon the prime rate of interest, best carries

---

[4] At footnote 14 of the *Till* opinion, the Court stated "when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce." The Bank's expert followed that approach. Aaron surveyed the market to determine the appropriate interest rate. The results of that survey effort verified his formula conclusion. The Supreme Court also stated that "[c]ongress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any of these provisions. Moreover, we think Congress would favor an approach that is familiar in the financial community and that minimizes the need for expensive evidentiary proceedings." *Till*, 541 U.S. at 474-75.

out Congress' intent for the Bankruptcy Code provisions that require discounting to present value. 7 COLLIER ON BANKRUPTCY ¶ 1129.06[1][c] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.). Speaking for the plurality, Justice Stevens opined that "[t]he resulting 'prime plus' rate of interest depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor." *Till*, 541 U.S. at 479. While declining to decide the scale of risk adjustment, the Court noted that other courts generally approved adjustments of 1% to 3%. *Id.* at 480. The Court went on to note that the cramdown requirement "obligates the court to select a rate high enough to compensate the creditor for its risk but not so high as to doom the plan. If the court determines that the likelihood of default is so high as to necessitate an 'eye-popping' interest rate, the plan probably should not be confirmed." *Id.* at 480-81.

This Court finds that the circumstances of the Debtor's Plan do not justify a 1% to 3% risk adjustment as such would not adequately compensate the Bank for all of the risks it faces. The Debtor's expert, Funsten, provided a cursory review of the collateral, capacity, plan circumstances and property characteristics in his analysis. However, it is not clear from his report or from his testimony at the hearing that those risks were actually provided for in his ultimate interest rate conclusion.

The Court finds that the report of Aaron, the Bank's expert, more aptly evaluates all of the risks. Aaron identified and explained the specific risk factors of the Loan and applied a series of rates using a formula approach. His report provided a detailed study of the Debtor's Plan, the projections therein, and the risks inherent given that data. He provided a well-reasoned analysis of the build-up approach. He began with a prime interest rate of 3.25%, and assigned additional rate adjustments to account for the Debtor's nonconforming Loan to reflect the risks associated with the 7-year Plan. He then conducted a market survey to ensure that his interest rate conclusion was consistent with rates in the appropriate market.

Aaron testified credibly that Funsten's interest rate analysis failed to sufficiently capture

the risks. In particular, the Court found Aaron's criticism of Funsten's decision to assign the prime rate of 3.25% to the A tranche of the Debtor's Loan to be convincing. Aaron explained that although the prime rate of interest does have some amount of built-in default security risk, a low rate of interest is generally reserved for a mature, stabilized property. (*See* Tr. Vol. IV, 746-748.) He noted that because of the Property's low occupancy rate and the overall competition in the market, a higher interest rate is warranted. (*See* Tr. Vol. IV, 747-48.) Aaron also takes exception to the methodology Funsten used in calculating the second, or B tranche of the Loan, remarking that Funsten failed to sufficiently account for the Debtor's specific asset, plans and risks. (*See* Tr. Vol. IV, 748-49.) Finally, Aaron noted in his report that an interest rate of 8.6% represents the lowest supportable rate for the repayment of the Bank's secured claim. (*See* Wells Fargo, Exhibit 7, pp. 2-3.)

### D.      Disclosure Requirements

The Bank complains that the Plan cannot be confirmed because the Debtor has not complied with the disclosure requirements of Section 1127 of the Code.

Section 1127(a) provides that the proponent of a plan may modify a plan at any time before confirmation. However, the plan proponent must also satisfy the disclosure requirements of Section 1125 with respect to the plan, as modified. 11 U.S.C. § 1127(c). Section 1125 provides in pertinent part:

(a) In this section–

(1) "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or

-23-

proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information;

11 U.S.C. § 1125.

The purpose of a disclosure statement is to provide creditors the information they need to decide whether to accept or reject the debtor's plan. The determination of whether the disclosure statement contains adequate information is made on a case-by-case basis under the facts and circumstances presented. *In re Scioto Valley Mortgage Co.,* 88 B.R. 168, 170 (Bankr. S.D. Ohio 1988).

Upon review of the Plan, it is clear that the Debtor has not complied with the disclosure requirements of Section 1125 as the Debtor has failed to provide sufficient information regarding the recently executed Master Lease and the circumstances of the tenant under the agreement, SE El Monte.  Because the rental income due the Debtor under the Master Lease is the sole source of funding for the Plan, the Court finds it critical that this information be included so that creditors can make an informed decision on whether to vote for the Plan.  As noted by the Bank in its Supplemental Objection, the Plan is devoid of information concerning the financial condition of the newly formed tenant entity, SE El Monte, its parent Storage, Etc., and the business relationships between the Master Lease tenant, the Debtor, and its Guarantors.  (*See* dkt. no. 631, p. 4.)

The Court agrees with the Bank; the Debtor's Plan fails to comply with the disclosure requirements of Sections 1125 and 1127.

In a related objection, the Bank argues that the Plan does not satisfy Section 1129(a)(5) of the Code because it does not provide information regarding the post-confirmation management

-24-

of the Reorganized Debtor.

> Subsection 1129(a)(5)(A)(i) requires that the court shall confirm a plan if:
> The proponent of the plan has disclosed the identity and affiliations of any individual
> proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of
> the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a
> successor to the debtor under the plan.

11 U.S.C. § 1129(a)(5)(A)(i).

The Court notes that the Debtor's Disclosure Statement provides some indication of the management structure of the Reorganized Debtor. It states that neither the Debtor's current owners nor the Guarantors of the Bank's claim will have an ownership interest in the Reorganized Debtor. (*See* Debtor's Disclosure Statement, dkt. no. 487, Section III. A, p. 5.) However, because Ronnie Schwartz will be the sole owner of the Reorganized Debtor, and he has an interest in the TAD 1993 Family Trust, which owns part of GAC El Monte Holding Co., LLC (a 50% owner of the Debtor), he is an indirect owner of the Debtor. Therefore, it would be reasonable to question the statement that no current owner will be an owner of the Reorganized Debtor. The Court also notes that the Plan is silent as to the management structure of the Reorganized Debtor. According to Mr. Schwartz's testimony at the hearing, he intends to bring on either himself or another entity which he would control as the manager of Newco and that the manager would have a 1% ownership interest in Newco. This information is not noted in the Debtor's Plan; it should have been disclosed. Debtor's failure to supply this information constitutes a failure to comply with Section 1129(a)(5)(A)(i).

### E.    The Absolute Priority Rule

The Bank also objects to confirmation of the Debtor's Plan under the "absolute priority rule." It argues that because the Plan proposes to transfer the equity interests of the Debtor to

-25-

certain insiders, it allows the current principals to determine who will own equity of the Reorganized Debtor and how much they will pay.

Generally, under the "absolute priority" rule, the claims of any objecting impaired class must be paid in full before a class of claims junior to it will be allowed to retain any interest under a Chapter 11 plan. The absolute priority rule is one of the conditions of the "fair and equitable" standard necessary for cram down of a proposed Chapter 11 plan over the objection of an impaired creditor. *In re Sentinel Mgmt. Group, Inc.* 398 B.R. 281, 319 (Bankr. N.D. Ill. 2008).

The Bank posits that the "insider nature" of the Plan warrants application of the absolute priority rule and that Schwartz formulated the Plan primarily for the benefit of himself, Noam Schwartz, Yoel Iny and their families. The Debtor responds that applying the absolute priority rule in this case violates the plain meaning of the statute, as the Debtor's Plan does not involve the transfer of "old equity." The Court finds that the Bank has the better argument.

In *Bank of America Nat'l Trust and Sav. Ass'n. v. 203 North LaSalle St. P'ship*, 526 U.S. 434, 454 (1999), the Supreme Court held that a debtor's plan violated the absolute priority rule by "vesting equity in the reorganized business in the debtor's partners without extending an opportunity to anyone else either to compete for that equity or propose a competing reorganization plan." The Seventh Circuit recently addressed this issue in *In re Castleton Plaza, LP,* No. 12-2639, 2013 WL 537269, at * 1 (7th Cir. Feb. 14, 2013). In the underlying bankruptcy case in *Castlelon*, the debtor's Chapter 11 plan provided that 100% of the equity in the reorganized debtor would go to the wife of the debtor's owner, who would invest $75,000 (later increased to $375,000). The court held that plans giving insiders preferential access to investment opportunities in a reorganized debtor should be subject to the same opportunity for competition as plans in which existing claim-holders put up new money. Thus, "[a]n impaired lender who objects to *any* plan that leaves insiders holding equity is entitled to the benefit of competition." *Id.* at *3. An "insider" is defined by the Bankruptcy Code as follows:

-26-

If the debtor is a corporation–

> (i) director of the debtor;
>
> (ii) officer of the debtor;
>
> (iii) person in control of the debtor;
>
> (iv) partnership in which the debtor is a general partner;
>
> (v) general partner of the debtor; or
>
> (vi) relative of a general partner, director, officer, or person in control of the debtor . . . .

11 U.S.C. § 101(31)(B).

The current ownership structure of the Debtor is as follows: The Debtor is owned by GAC Storage, LLC which holds a 50% membership interest, and GAC Storage El Monte Holding Co., LLC which holds the remaining 50% membership interest. GAC Storage, LLC is owned by D.M.S.I., LLC, Sunset Storage Partners, LLC, and Silver Valley Investments, LLC. GAC Storage El Monte Holding Co., LLC is owned by JAND Investments, D.M.S.I., LLC, David Dahan & Yaffa Dahan, TAD 1993 Family Trust, Drorit Investments, Ltd., Orit Sprecher, Ofra Kestenbaum, Erez Schwartz, Ronit Alkalay and Mike Mercer. Ronnie Schwartz is the Secretary of Great American Capital, Inc., which is the Manager of D.M.S.I., LLC. Ronnie Schwartz, who will be the sole and managing member of the Reorganized Debtor, holds a beneficial interest in the TAD 1993 Family Trust[5]. (*See* Debtor's Exhibit B, Section II. A, dkt. no. 487, p. 2.)

Given the ownership structure of the Debtor, it is clear that Schwartz is an insider within the meaning of Section 101(31)(B)(iii) as a person in control of the Debtor. He is a partial owner of GAC Storage El Monte Holding Co., LLC through the TAD 1993 Family Trust in which he

---

[5]The Court notes that the Debtor's Disclosure Statement references both a "TAD 1993 Trust" and a "TAD 1993 Family Trust" within the same paragraph. *See* Debtor's Exhibit B, Disclosure Statement, Section II, p. 2.

holds a beneficial interest as the trust is an owner of GAC Storage El Monte Holding Co., LLC. (*See* Tr. Vol. V, 1028.)   In addition, he was principally responsible for negotiating the Debtor's involvement with the Master Lease. (*See* Tr. Vol. V, 1028, 1059.) The Debtor's Plan contemplates the issuance of 100% of the equity in the Reorganized Debtor to Schwartz, in exchange for a new equity contribution of $146,000.  In light of the *Castleton* decision, the Court determines that the absolute priority rule applies, despite the fact that Schwartz is not a direct owner or investor. The Debtor's Plan proposes to give Schwartz, an insider of the Debtor, preferential access to an investment opportunity in the Reorganized Debtor.  However, the Plan has to provide an opportunity for competition, as the holding in *Castleton* instructs.

### F.      The Guarantors Injunction

The Bank objects to the inclusion of the Guarantors Injunction, which it contends is not essential to the Debtor's Plan and improperly deprives it of its bargained for state law rights under various loan guarantees.

The standard for approval of a release in a plan of reorganization in favor of a nondebtor third party is that the provision be narrowly tailored and essential to the reorganization plan as a whole. *See In re Ingersoll, Inc.*, 562 F.3d 856, 864-65 (7th Cir. 2009); *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 657 (7th Cir. 2008).

The Court must decide whether the injunction in question is appropriate for the Debtor's Plan. The Court determines that it is not.

The release at issue herein provides as follows:

Guarantors Injunction. In consideration for Newco funding the New Equity Contributions and the Guarantors funding the Guarantor Contributions, entry of a Confirmation Order will operate as an injunction against the commencement or continuation of an action, the employment of process, or any act to collect, recover or offset any Claim of any Holder against the Guarantors under the Bank Loan Documents or otherwise, which Guarantors Injunction shall be effective so long as the Reorganized Debtor is performing its obligations under the Plan and no Default has occurred.

*See* Debtor's Exhibit A, Third Amended Chapter 11 Plan, p. 24, Article VIII, Section 8.4, dkt.

-28-

no. 613.

The inclusion of the Guarantors Injunction is a condition precedent to Schwartz's
$146,000 new equity contribution and the Guarantors' contribution of $100,000 to the Plan.
Schwartz, who will be the sole member of the Reorganized Debtor, testified that he will
contribute the capital only if the Guarantors Injunction is approved. He explained that the funds
would be used for unknown expenses and shortfalls to take care of monthly payments to the
Bank. The Guarantors Injunction was characterized by Schwartz as a "temporary injunction."

Schwartz testified that the provision is necessary because of concerns that the Bank could
initiate unnecessary litigation against the Guarantors. (*See* Tr. Vol. V, 926, 965.) However,
Schwartz was unable to articulate sound business reasons for including this provision or whether
the success of the Plan is contingent upon its inclusion. Schwartz testified that he made no
efforts to solicit third party equity contributions in lieu of the injunction because he was unaware
of any capital market that would be willing to come into such an uncertainty. (*See* Tr. Vol. V,
1071-72.)

In support of the proposed Guarantors Injunction, the Debtor relies on the Seventh
Circuit's decision in *Airadigm*. There the court considered whether a bankruptcy court has the
authority to release a nondebtor third party from creditor liability over the creditor's objection.
The court ultimately held that such a release is "appropriate," but explained that "[w]hether a
release is 'appropriate' for the reorganization is fact intensive and depends on the nature of the
reorganization." *Airadigm*, 519 F.3d at 657. The court first determined that the limitation itself
was narrow, in that it applied only to claims "arising out of or in connection with" the effort to
reorganize; and that there was "adequate" evidence that the financier of the plan "required this
limitation before it would provide the requisite financing, which was itself essential to the
reorganization." *Id.* at 657. *See also In re Berwick Black Cattle Co.*, 394 B.R. 448, 459 (Bankr.
C.D. Ill. 2008) ("The release at issue in *Airadigm* was nothing more than the kind of narrowly
tailored release that is customary in Chapter 11 plans . . . [N]evertheless, it was not simply rubber
stamped by the Seventh Circuit, which applied a three-part analysis.").

The bankruptcy court in *In re Berwick Black Cattle Co.* denied confirmation of a plan that included blanket third party release provisions. 394 B.R. at 457. The releases covered prepetition claims and other claims that were unrelated to the bankruptcy proceedings. The court held that the releases went well beyond what the Seventh Circuit approved in *Airadigm*, as they purported to release from liability third parties in a nonbankruptcy suit over which the court had no jurisdiction. *Id.* at 462.

The Guarantors Injunction is overly broad. It would enjoin the Bank from the "commencement or continuation of an action, the employment of process, or any act to collect, recover or offset any Claim of any Holder against the Guarantors under the Bank Loan Documents *or otherwise*, which Guarantors Injunction shall be effective so long as the Reorganized Debtor is performing its obligations to the Bank under the Plan and no Default has occurred." (Emphasis added). The provision is not narrow in scope, as the clause "or otherwise" could enjoin the Bank from pursuing its contractual remedies against the Guarantors for other loans. The Bank rightfully has cause for concern given this broad language, as the Guarantors have additional obligations under other loan documents. (*See* dkt. no. 631, filed by Wells Fargo, p. 9, ¶ 23.) The Bank alleges that the Guarantors are in default on numerous covenants and agreements under the Guarantees. (*Id.* at ¶ 23.) Schwartz acknowledged that the Guarantors have at least seven civil matters pending against them. (*See* Tr. Vol. V, 1076-77.) In light of the foregoing, the Court finds that the Plan's Guarantors Injunction provision is overly broad.

The Court also finds that Schwartz's proffered goal to protect the Guarantors from unnecessary litigation is not tantamount to unusual circumstances that render the release terms important to the success of the Plan. *See Ingersoll,* 562 F.3d at 864-65), (citing *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 143 (2d Cir. 2005)) ("A nondebtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to the success of the plan . . . ."). The evidence establishes that none of the Guarantors have claims against the Debtor's estate. (*See* Tr. Vol. V, 966-67.) Schwartz's concern that the Debtor could be dragged into litigation involving the Guarantors is not warranted, as the Guarantors have no claims against the Debtor, at least none filed in this

-30-

bankruptcy case. The Order Setting Deadline to File Proof of Claims in this case required that proofs of claim be filed on or before June 29, 2012. (*See* dkt. no. 356.) The claims registry reflects that no proofs of claim have been filed by the Guarantors against the Debtor, nor do the Debtor's schedules reflect such claims. The Guarantors Injunction is not essential to the Debtor's reorganization.

Further, the Court declines to approve the Guarantors Injunction because there is no evidence that the Guarantors will spend any time managing the Reorganized Debtor. (*See* Tr. Vol V, 1076.) *See, e.g., Gander Partners, LLC v. Harris Bank, N.A.,* (*In re Gander Partners, LLC*), 432 B.R. 781, 788 (Bankr. N.D. Ill. 2010 ), *aff'd,* 442 B.R. 883 (N.D. Ill. 2011) (noting that an injunction restraining creditors from proceeding against nondebtors is justified only if creditor actions in that regard would frustrate the debtor's reorganization efforts by distracting the guarantors from reorganizing the debtor).

In *In re Gander Partners,* this Court observed that "[a] section 105 injunction restraining creditors from proceeding against nondebtors is justified only if the creditor actions would interfere with, deplete or adversely affect property of a debtor's estate or which would frustrate the statutory scheme embodied in Chapter 11 or diminish a debtor's ability to formulate a plan of reorganization." 432 B.R. at 788. Courts recognize that the entry of an injunction may be appropriate under the following circumstances:

1. there be the danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize[6];

2. there must be a reasonable likelihood of a successful reorganization;

3. the court must balance the relative harm as between the debtor and the creditor who would be restrained; (and)

4. the court must consider the public interest; this requires a balancing of the public interest in successful bankruptcy reorganizations with other competing societal interests.

---

[6]The Seventh Circuit does not require a showing of irreparable injury. *See Fisher v. Apostolou,* 155 F.3d 876, 882 (7th Cir. 1998).

*Id.* at 788 (citing *In re Monroe Well Service, Inc.*, 67 B.R. 746, 751-52 (Bankr. E.D. Pa. 1986)).

Here, although not required, the Court determines that there has been no showing of danger of imminent, irreparable harm to the Debtor's ability to reorganize. There is no reasonable likelihood of a successful reorganization, as the Debtor's financial projections are unreasonable. Balancing the harm as between the Bank and the Debtor, the Court finds that restraining the Bank is not justified because the Guarantors' time and energy are not directed toward the Debtor's reorganization. The public interest would not be served by issuing the Guarantors Injunction as the reorganization proposed herein is not likely to be successful.

### G.    Classification of Claims

The Bank argues that the Plan should not be confirmed because the Debtor's classification of claims violates Section 1122(a) of the Code.

Section 1122(a), which governs classification of claims or interests, provides: "Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). That section does not mandate that a plan proponent classify similar claims together. It provides that dissimilar claims cannot be placed into the same class. *In re Loop 76, LLC,* 465 B.R. 525, 536 (B.A.P. 9th Cir. 2012). Although debtors are prohibited from separately classifying claims to "gerrymander an affirmative vote on reorganization," claims may be classified separately if "significant disparities exist between the legal rights of the holders . . . which render the two claims not substantially similar." *In re Wabash Valley Power Ass'n., Inc.*, 72 F.3d 1305, 1321 (7th Cir. 1995) (internal citations omitted).

Section 1122(b) provides that a "plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience." 11 U.S.C. § 1122(b). "The proponent

of the plan must demonstrate a justification for its classification scheme and that the classification is not motivated by the purpose of gerrymandering an affirmative vote of an impaired class." *See In re Porcelli*, 319 B.R. 8, 10 (Bankr. M.D. Fla. 2004) (citing *In re Holley Garden Apartments, Ltd.*, 223 B.R. 822, 824-25 (Bankr. M.D. Fla. 1998)).

Here, the Bank argues that the Debtor impermissibly separately classifies the Class 5 general unsecured claims under $1,500, from the Class 7 general unsecured claims. The Debtor responds that instead of receiving minuscule monthly distributions during year 2 of the Plan that would be administratively burdensome for the Reorganized Debtor and the creditors, the convenience Class 5 unsecured creditors will receive a lump sum payment within thirty days of the Plan's Effective Date. The Court need not decide whether the Debtor's proffered justification is sufficient, however, as there is no risk of inappropriate gerrymandering since each of the unsecured creditors in Classes 5 and 7 have voted to accept the Debtor's Plan. (*See* Debtor's Exhibit E, Ballot Report, dkt. nos. 511, 517, 518, 521.) Accordingly, the Bank's objection in this regard is overruled.

### H.    Good Faith in Filing the Plan

The Bank argues that the Plan is not proposed in good faith because its main purpose is to protect the nondebtor Guarantors.

The Bankruptcy Code requires that a debtor's plan be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(3). Bankruptcy judges have broad discretion in determining whether a debtor's plan has been filed in good faith. *In re American Consol. Transp. Cos., Inc.*, 470 B.R. at 492. Good faith is "generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *203 N. LaSalle St. P'ship, 126 F.3d at 969, rev'd on other grounds* (internal citation omitted). Further, the plan must have "a true purpose and fact-based hope of either 'preserving going concern' or 'maximizing property available to satisfy

-33-

creditors.'" *In re American Consol. Transp. Cos., Inc.*, 470 B.R. at 493 (internal citation omitted).

Schwartz testified that the main purpose of the Plan is to repay the Bank's claim in full. (*See* Tr. Vol. V, 923.) The evidence presented in these proceedings suggests otherwise. Rather than offer the new investment opportunity to others, which might have procured additional funds for the Debtor, Schwartz elected to condition his contribution and the Guarantors' contribution on the entry of a nonconsensual Guarantors Injunction. In doing so, he foreclosed the opportunity for others to provide a larger new equity contribution which could have been used to satisfy the Bank's claim. For this reason, the Court concludes that the Plan was not proposed in good faith.

## V.     The Bank's Motion for Relief from the Stay

On August 27, 2012, the Bank filed a motion seeking relief from the automatic stay, pursuant to Section 362(d) of the Code. (*See* dkt. no. 552.)

That section provides in pertinent part as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay–
>
>> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>> (2) with respect to a stay of an act against property under subsection (a) of this section, if –
>>> (A) the debtor does not have an equity in such property; and
>>> (B) such property is not necessary to an effective reorganization;

11 U.S.C. §§ 362(d)(1) and (2).

Generally, a secured creditor is entitled to relief from the automatic stay under Section 362(d)(1) for "cause." Under Section 362(d)(2), a secured creditor is entitled to stay relief if the debtor lacks equity in the property, and the property is not necessary for an effective

reorganization. "To be 'effective,' a plan must be confirmable." *Edgewater Walk Apartments v. MONY Life Ins. Co. of Am.*, 162 B.R. 490, 498 (N.D. Ill. 1993). Thus, the confirmation requirements of 11 U.S.C. § 1129 must be met. *Id.*

The Bank, as the moving party, bears the burden of proof on the issue of the Debtor's equity in the Property. The Debtor bears the burden of proof on all other issues, such as whether the property is necessary to an effective reorganization. *See* 11 U.S.C. §§ 362(g)(1) and (2).

The Debtor must show that there "is a reasonable possibility of a successful reorganization within a reasonable time." *In re Caldwell Corners P'ship*, 174 B.R. 744, 759 (Bankr. N.D. Ill. 1994) (citing *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375 (1988)); *Edgewater*, 162 B.R. at 495. "This is known as the feasibility standard." *In re 8th Street Village Ltd. P'ship*, 94 B.R. 993, 995 (N.D. Ill. 1988).

The Bank's Relief from Stay Motion is premised in part on the Debtor's inability to propose a confirmable plan of reorganization. The Bank argues that the Debtor's Plan fails to meet the requirements of: (1) Section 1129(a)(1), mandating compliance with applicable Code provisions; (2) Section 1129(a)(7), by not providing sufficient value to the Bank in the seventh year of the Plan; (3) Section 1129(a)(8), which requires that each class accept the plan or not be impaired under the plan and (4) Section 1129(a)(11), which requires that the plan proponent establish that the Plan is not likely to be followed by liquidation, the need for further financial reorganization of the debtor or any successor to the debtor.

The Court finds that the Debtor has not carried its burden of proving by a preponderance of the evidence that its Plan is feasible. *In re Repurchase Corp*, 332 B.R. at 342. The Debtor presented no credible evidence to support its contention that the Debtor will be able to finance the nearly $8.2 million balloon payment to the Bank at the end of the 7-year Plan term. The Court accords little weight to Detling's testimony that in year 2019 the Property will be worth $9.6 million for several reasons: (1) his opinion is highly speculative in light of his testimony

concerning the Appraisal Institute's recommendation when determining the future value of an asset; (2) the credible testimony of the Bank's expert and (3) the Debtor's historic performance.

The Plan relies on highly speculative revenue projections, the achievement of which are not supported by the evidence. According to the Bank's feasibility expert, if the Property fails to meet its forecasted cash flow by 10%, it will lead to substantial deficiencies throughout the Plan term. (*See* Wells Fargo Exhibit 7, p. 4, Report of MCA Financial Group, Ltd.); *see In re Made in Detroit, Inc.*, 299 B.R. 170, 179-80 (Bankr. E.D. Mich. 2003) (a court denied confirmation of debtor's plan and confirmed a competing plan where the debtor failed to demonstrate the ability to obtain financing). As noted above regarding confirmation, the evidence established that the Debtor's sole tenant under the Master Lease, SE El Monte, had yet to be capitalized. In the event the Debtor's Property is unable to perform according to the aggressive projections set forth in the Plan, the Debtor has not shown that SE El Monte will have sufficient cash reserves to satisfy its rent payment obligations to the Debtor.

The Court also finds that the Debtor has failed to demonstrate a reasonable possibility of executing a successful reorganization within a reasonable period of time. The Debtor's bankruptcy case has been pending for over a year, during which period of time it has not been able to propose a confirmable plan of reorganization.

Finally, the Court finds that the Debtor has failed to establish that there is equity in the Property. The parties do not dispute the $8.1 million value of the Property, or the Bank's $12.4 million claim amount. (*See* Tr. Vol. I, 9-10; Stipulation, dkt. no. 423, p. 2, ¶ C.) At $8.1 million in value with a claim amount of $12.4 million, the Court determines that the Debtor does not have an equity in the Property.

The Court finds that pursuant to Sections 362(d)(2)(A) and (B), the Debtor does not have equity in the Property and that such Property is not necessary to an effective and timely reorganization.

The Court previously entered separate orders herein denying confirmation and lifting the automatic stay on February 28, 2013.  Those orders stand.


Dated: March 19, 2013                              ENTER:

                                                   _Jacqueline P. Cox_____
                                                   Jacqueline P. Cox
                                                   U.S. Bankruptcy Judge